JAMES F. McKAY III, Chief Judge.
| STATEMENT OF THE CASE
On February 24, 2011, the State indicted Benjamin T. Webb, also known as Webb Benjamin, also known as Tyronne Benjamin (defendant) with two counts of aggravated rape (counts 1 and 2), violations of La. R.S. 14:42, and one count (count 3) of aggravated kidnapping, a violation of La. R.S. 14:44. The defendant pled not guilty on all charges on March 15, 2011.
On July 14, 2011, the district court heard and granted the State’s motion to introduce evidence of other crimes.
On July 23, 2012, the defense filed a motion to suppress the DNA evidence; and a motion in limine to bar the State’s DNA expert giving opinion testimony about tests she had not performed personally; and challenged the constitutionality of non-unanimous jury verdicts. The district court denied those motions the same day.
The defendant’s jury trial began July 23, 2012; and on July 25, 2012, the jury returned verdicts of guilty of forcible rape (La. R.S. 14:42.1) as to count 1, guilty of aggravated rape (La. R.S. 14:42) on count 2, and guilty of second degree kidnapping (La. R.S. 14:44.1) on count 3.
|2On August 10, 2012, the defendant filed motions for post-verdict judgment of acquittal, for new trial and to reconsider sentence, all of which were denied. That same day, the defendant filed a motion for *262 appeal and designation of record, which was granted.
On August 14, 2012, the district court sentenced the defendant to life imprisonment at hard labor on count 2 and to forty years at hard labor on each of counts 1 and 3, with credit for time served, sentences to be served concurrently.
On September 5, 2012, the defendant filed another motion for appeal and designation of record.
STATEMENT OF THE FACTS
On November 30,1999, Detective Clifton Neely of the New Orleans Police Department (“NOPD”) Sex Crimes Division responded to a call of sexual assault at 2228 Port Street. He met with M.M.,[1] the victim, who was terrified and recounted that she had been raped in her bedroom by an unknown assailant. The detective instructed the crime lab to photograph the scene and the bruises on the victim’s wrists. During the investigation, Detective Neely found a length of telephone cord that was used to bind the victim’s hands. He also retrieved a multicolored handkerchief or cloth from under the victim’s bed.
The victim directed Detective Neely to the point of entry — the rear door of the house. The detective observed that the assailant pried out the middle panel of the door and pushed it open.
Detective Neely identified the six-page crime lab report, which listed the evidence obtained from the crime scene, including pictures, two latent fingerprints, |sand one set of elimination prints from the victim and the multicolored handkerchief. The detective testified that the evidence retrieved from the scene was deposited in Central Evidence and Property (CE & P) by the crime scene technician.
The victim was transported to the hospital where she underwent a sexual assault exam. The sexual assault kit was deposited in CE & P pending further testing. A receipt was identified, as the receipt that was issued by CE & P upon receiving the sexual assault kit, a pair of striped pants and white underwear, both of which the victim wore after the attack.
On cross-examination, Detective Neely admitted that he was not in the room at the time hospital personnel performed tests and completed the sexual assault kit, but he explained that he retrieved the kit from the hospital on December 15, 1999, from the “SANE” (Sexual Assault Nurse Examiner) room (a separate, refrigerated, secure area at the hospital) and deposited it with CE & P that same day. The clothing taken from the victim at the time of the sexual assault exam was also stored under refrigeration with the kit. Detective Neely explained that the name “Dante Rivers” was listed as a suspect on the CE & P receipt for the sexual assault kit at the time of deposit. However, that was a typographical error, which explains why the name “Dante Rivers” was crossed through and replaced with “unknown” on the line identifying the suspect.
NOPD Officer George Jackson, a fingerprint examiner for the city, testified that he had conducted latent print examinations testing thousands of times and been qualified as an expert in his field. Officer Jackson identified State’s exhibit 2, bearing case number K52439, as a set of victim elimination prints and two latent prints lifted from the scene. He compared *263 State’s exhibit 5, a set of ink-rolled | ¿fingerprints and flat impressions taken from the defendant immediately prior to trial, to State’s exhibit 2 but was unable to link the defendant to the latent prints lifted at the crime scene.
Sergeant James Kelly of the NOPD Sex Crimes Unit investigated the aggravated rape of M.M., as well as the aggravated rape of N.S. The two rapes did not occur at the same time, but Sergeant Kelly was aware of the DNA (CODIS[2]) match to the defendant as to both M.M. and N.S. He contacted M.M. in 2010 in connection with a follow-up investigation. Sergeant Kelly did not show M.M. the defendant’s picture because DNA identified the defendant as her assailant. Based upon his investigation, the sergeant obtained a warrant for the defendant’s arrest at his 2224 Port Street residence. Sergeant Kelly testified that at the time of the investigation of the CODIS match in this case, he was assigned to investigate the aggravated rape of N.S., which also produced a CODIS match to the defendant.
Sergeant Kelly obtained a buccal swab from the defendant after his arrest. Sergeant Kelly explained that a buccal swab serves as an additional identity confirmation to a match with the CODIS system. Sergeant Kelly identified State’s exhibit 6 as the sealed buccal swab he received from the defendant, and he confirmed that it was a match to the defendant as to the aggravated rapes of M.M. and N.S.
M.M. testified that she was raped three times on the night of November 30, 1999. At that time, she was living with her three young children at 2228 Port Street — one half of a shotgun house. Her mother lived next door to her at 2226 |fiPort Street. M.M. recounted that she went to bed at about 10:00 p.m. on November 30, 1999. She was sleeping on a bed in the living room with two of her children when she was awakened by a man clothed in black, wearing a hood and tapping a gun on her foot. The man told her to be quiet and made her face the wall. He removed her jewelry and told her to exit the bed backwards, which she did. The man removed her scarf from her head and blindfolded her with it. Then he tied her hands behind her back with a telephone cord. As M.M. stood there, the man searched the living room. After that, he ordered M.M. to go to the bedroom, where he placed her on the bed on her back and removed her pajama pants. He raped her for the first time. As M.M. lay on the bed crying, the man began to search her home for money, drugs and jewelry. When he had searched the house, the man returned to her in the bedroom and raped her for the second time. M.M. was still blindfolded with her hands tied behind her back. He told her that he had been watching her for about three years and asked her why she had no man and lived alone. She continued talking to him because she feared for her children. At that point, her assailant raped her for the third time. After that, he led her to the kitchen to get a cold drink. From there he accompanied her to the bathroom, after which they returned to the kitchen. When the man had taken all the jewelry in the house and a BB gun she kept on hand, he sat M.M. on the bed and untied her hands but kept her blindfolded. He told her not to uncover her eyes until after she counted to fifty. He told her “to get an alarm system, a gun or some type of protection, because next time [she] might not be so lucky.” M.M. could feel the man’s presence standing and watching *264 her. When she was certain he was gone, she removed the blindfold, ran to check on her children, and called the police. 16When the police arrived, M.M. recounted her ordeal. They transported her to the hospital where she underwent a sexual assault exam.
M.M. denied knowing her assailant, and she testified that she did not consent to any sexual activity with the assailant.
NOPD Complaint Operator Erin Williams testified, explaining that when a 911 call is received by the department, the call is recorded and assigned an item number, in this case L-32758-99. The call is also assigned an incident recall, which is a hard copy of the contents of the call.[3] The incident recall reflected that a signal 60 (home invasion) call came into the 911 operator in November 1999 at 5:42 a.m. from 2414 S. Rocheblave giving a clothing description of two black male suspects. Police dispatch reported that the call was actually of an aggravated rape.
Ms. Williams explained that the tape of this 911 call was unavailable at the time of trial because 911 calls in 1999 were kept for only three years.
N.S. testified that she was nineteen years old on December 19, 1999, when she was raped. At the time of the assault, N.S. lived with her grandmother and twin sister on Louisiana Avenue Parkway. That night, N.S. left the house at midnight to visit a friend, who lived on the corner of Walmsley and Broadmoor Streets. As she walked, a black male drove up in a light blue Tempo brandishing a gun and ordered her to get into the vehicle. When N.S. got into the car, the suspect demanded her jewelry, coat and cell phone. She complied with his demands. The suspect drove the car to a gas station and purchased a drink. He warned N.S. that if she got out of the car, he would kill her. The suspect returned to the vehicle and drove the vehicle to an area near St. Roch Park where he stopped and asked |7another black male if he wanted to join the pair. When the man declined, her assailant drove the-car to a bridge near North Claiborne and Elysian Fields Avenues. The assailant made N.S. blindfold herself with a black bandana he supplied. After she did as he ordered, the assailant reclined her seat, removed her pants and raped her. After the attack, he told her: “I ought to kill you.” As N.S. begged for her life, the assailant asked: “Where the f - - k do you stay?” N.S. directed him to her aunt’s house to protect her grandmother and sister. On the way to her aunt’s house, the assailant returned to St. Roch Park and picked up the man who did not want to participate in the rape. When the trio arrived at her aunt’s house, the two men forced their way in at gunpoint. The rapist ordered the occupants of the house to lie on the floor while he tied them up with the telephone cord. Meanwhile, the other man removed televisions, jewelry, DVDs and clothing from the premises into the rapist’s car. Before the assailants drove away, the rapist tripped the circuit breaker, leaving the helpless victims in the dark. One of N.S.’s neighbors called the police. N.S. supplied the police with all pertinent information, and they transported her to the hospital where she underwent a sexual assault exam. She was hospitalized for about a week after the rape.
Upon her return to her grandmother’s house, the police interviewed her and accompanied her to the rape scene, which the officers searched and photographed. From there, she and the police drove to St. Roch Park to view that scene. During the course of the police investigation, her sis *265 ter called N.S.’s cell phone. A male answered but refused to identify himself. N.S. testified that she got a good look at her rapist and would never forget his face because of the terror he inflicted upon her that night. She identified the defendant at trial as the man who raped her in December 1999.
|8Ms. Gina Pineda was qualified by the court as an expert in the field of molecular biology and DNA analysis. She obtained a Bachelor of Science Degree, with a concentration in microbiology and chemistry, in 1996 from Louisiana State University, and a Master of Science Degree in pathology, with a concentration in forensic DNA in 2003 from LSU Medical School in New Orleans. She worked for Reliagene Technologies, a private DNA testing company, from 1996 until the end of 2007, when the company was acquired by Orchid-Selmark. She continued to work for Orchid-Selmark as assistant lab director and technical leader. At the time of this trial in July 2012, Ms. Pineda was operating a consulting business, GMP Forensic Consultants, consulting with different companies and agencies involved in the field of human identity DNA testing. However, at the time of the testing in this ease (2008), she was employed by Reliagene Technologies. She calculated that she has performed thousands of DNA tests. Ms. Pineda testified that she has been qualified as an expert in twenty-six states, Canada and Australia. Further, she holds all the credentials her profession requires, and she regularly attends continuing education classes to keep abreast of recent developments in her field.
Ms. Pineda explained that 99% of our DNA is identical to every other human, i.e., that gives every human hands, feet, eyes, legs, etc. However, it is the 1% of our DNA that distinguishes every human from all other humans. From that 1%, thirteen genetic markers are tested to establish each person’s individuality from everyone else.
Following an exhaustive explanation of DNA, its use and importance to forensic investigation, and the qualifications, standards (national and international) and accreditation process required operate a DNA lab, Ms. Pineda explained that on August 4, 2003, with reference to these cases, Reliagene received two separate ^submissions, NOPD Item Nos. K-52439-99 and L-32758-99, each containing a blood sample of the victim and an unknown sample derived from rape examination kits.
Ms. Pineda identified State’s exhibit 9 in globo as a report of all the testing performed by Reliagene in the above referenced cases, including a summary of test results in the form of final reports and data supporting those findings. She testified that State’s exhibit 10 was a chart of the DNA test results taken directly from the final reports and that State’s exhibit 11 was a chart of DNA test results in the second case referenced herein (L-32758-99). Next, Ms. Pineda rendered a detailed explanation for the jury of the test results generated from the two DNA samples submitted with K-52439-99 and L-32758-99. She explained that the lab separates out the victim’s DNA from any sperm DNA to produce a profile from the female victim, the epithelial fraction, and a profile of the male, the sperm cell fraction.
Ms. Pineda graphically explained to the jury how the epithelial fractions from K-52439-99 and L-32758-99, led to the conclusion that the victims of these crimes were different; however, the profile from the sperm fractions of the samples from those two cases were identical and consistent with having come from the same male donor.
*266 Continuing, Ms. Pineda explained that CODIS is a national data base for DNA information, much like the national data base for fingerprints. There are three levels of CODIS. The first is the local level, “LDIS”, which can be either the NOPD or the State Police Crime Lab. The next level is the “SDIS”, the State DNA Index System, which is where all agencies within one state can compare each other’s DNA profiles, which have been uploaded into the database. The third level, “NDIS”, the National DNA Index System, which is where different states |10can compare their databases to each other. Furthermore, Ms. Pineda informed the court that CODIS is operated by the FBI under strict rules, for example, the FBI requires identification of ten genetic marker profiles before the information can be uploaded to the national database. However, LDIS is more stringent in that it requires a compliment of thirteen proven genetic markers, which was met in these cases. Ms. Pineda explained that private laboratories cannot access or upload a profile to CODIS, but all state agencies can. To that end, Ms. Pineda testified that in early 2000, Reliagene contracted with the NOPD to perform DNA analyses on backlogged NOPD rape kits. NOPD personnel would drop off a set number of rape kits, and Reliagene would process them and report the DNA profiles back to the NOPD. Once the work and results were reviewed and confirmed by the NOPD, the data was uploaded into CODIS in 2004. After the 2004 upload, NOPD confirmed that the sperm profiles in the K-52439-99 and L-32758-99 matched. The NOPD crime lab issued a lead letter advising local law enforcement of the match. Once the local investigators receive the lead letter, the information is sent to the LDIS for further comparison and identification. In 2006, the State Police Crime Lab verified the match and notified the NOPD of the name of the sperm donor in the two cases.
During cross-examination, Ms. Pineda admitted that she did not perform testing on the samples she testified about. She did, however, interpret the test results and drew the conclusions she expressed during her testimony. Further, she stated that just like the FBI lab, Reliagene had teams of technicians or analysts that had been properly trained and supervised by her to do the actual testing. Ms. Pineda verified that DNA labs have strict testing controls to follow. These testing controls are documented during each phase of testing and memorialized in the case Infile. Her review of those testing controls as documented by the analysts in the case files of these samples produced expected results. If the analysts who performed the testing had not followed established test protocols, Ms. Pineda would have noticed the error while interpreting the results. She also confirmed that when the lab receives the DNA samples, the identity of the DNA donor is unknown and remains unknown to her lab even after the testing.
Ms. Angela Delatte, a Louisiana State Police (LSP) Crime Lab forensic scientist, was qualified by the district court as an expert in the field of DNA analysis. She verified that the LSP crime lab is nationally accredited and employs testing protocols mandated by the FBI. Ms. Delatte provided the jury with an overview of the four C’s testing procedure — clean, count, copy and compare — utilized in this case on the buccal swab taken from the defendant and submitted for development of a DNA profile. As evidence is submitted to the LSP crime lab, it is issued a unique identifier number. She identified State’s exhibits 13 and 14 as the reports generated from the testing in this case. Those reports memorialized the testing procedure employed, development of a DNA profile from the *267 buccal swab, and the conclusions drawn from the comparison of her findings with that of the Reliagene reports, and concluded that the profiles belonged to the same man, the defendant. Further, Ms. Delatte identified State’s exhibit 15 as the statistical analysis generated from her testing. She testified that she compared the DNA profile she obtained from the reference buccal swab from the defendant to the male DNA profile conclusions in the Relia-gene reports as to the sperm fraction of the vaginal swab. She confirmed that her testing proved that the probability of finding the same duplicate male DNA profile from an unrelated, unknown individual other than the defendant was one in one hundred seventy-six quintillion.
|12Ms. Thelma Magee testified that her residence at 1743 Gallier Street was burglarized on February 21, 2000. That night she was sleeping when she heard one of her three daughters scream. Ms. Magee awoke to find a man wearing a scarf or hood over his face, pointing a gun at her. He told her he wanted money and jewelry. Ms. Magee gave him her purse. He rifled through her jewelry box removing valuables. He also stole her cell phone. She let the suspect out of her house as he threatened her and her daughters that if they called the police, he would return. After hearing a bucket tumble over in the alley, she called the police. Ms. Magee related the incident to the police, who dusted for fingerprints in the house and window sill and confiscated the bucket from the alley. The following April, the police informed her that fingerprints located at the scene belonged to the defendant.
Sergeant Claude Flot, a thirty-five year veteran of the NOPD, testified that he participated in the investigation of the Gal-lier Street burglary. He recalled that there were seven prints lifted from a bucket in the alleyway of the residence. Sergeant Flot testified that the suspect used the bucket to gain entrance through a window. The fingerprints proved to belong to the defendant. The sergeant identified State’s exhibit 17 as the latent prints lifted from the scene and State’s exhibits 18 and 19 as the crime lab report on the fingerprints and a supplemental report documenting the match to the defendant’s fingerprints, respectively.
The State recalled Officer George Jackson, the State’s latent fingerprint expert. The officer reviewed State’s exhibit 19 and explained that Officer Terry Bunch was the examiner who identified the prints and Officer Raymond Loose was the verifying officer. He further stated that neither Officers Bunch nor Loose was with the NOPD at the time of trial. Consequently, he examined, compared, rejverified13 and established the validity of the report compiled by Officer Bunch for purposes of this trial.
The defense called Detective James Kelly, who reiterated that he took over the investigation of the aggravated rapes of M.M. and N.S. Detective Kelly stated that the police report in the N.S. case indicated that the victim said she had been raped by two men and mentioned nothing about walking from her grandmother’s house. Further, the report indicated that a second male was in her assailant’s car from the beginning of her abduction, not that he joined her and the assailant later during the night.
On cross-examination, Detective Kelly stated that he was not involved in the initial investigation of N.S.’s rape; that he did not write the report in that case; and that the officer who authored the report was no longer with the police force. The detective admitted that he did not have access to any supplemental reports in the rape case.
*268 The defense also called Detective Neely to re-establish that he spoke with M.M. immediately after the rape. He recalled that his report did not indicate the victim described her assailant’s clothing or that she saw a gun, nor did she indicate that she was raped three times by the assailant. Further, Detective Neely testified that his report reflects what the victim told him at the time of the offense. Continuing, the detective acknowledged that the CE & P receipt in this case reflected the name of the suspect as “Dante Rivers.” He stated that he corrected the receipt to read “unknown” in place of “Dante Rivers”, who was charged with carnal knowledge of a juvenile and was never a suspect in this case.
During cross-examination, Detective Neely confirmed that State’s exhibit 4 (defense exhibit 2) indicates M.M. as the victim in item number K-52439-99. | uNeely recalled that M.M. was traumatized at the time he spoke to her but that she did indicate that she had been raped at least two times; that her hands were bound with the telephone cord; and that the rapes occurred in her bed. He also said that the evidence at the crime scene and M.M.’s bruised wrists conformed with the victim’s rendition of events that night.
ERRORS PATENT
A review for errors patent on the face of the record reveals three.
The first error patent stems from the trial court’s failure to deny benefits of parole, probation and suspension of sentence on the defendant’s life sentence for aggravated rape (count 2, La. R.S. 14:42). However, La. R.S. 15:301.1(A) provides that in instances where the statutory restrictions are not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court. State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. Because the correction is statutorily effected, no corrective action is required to correct this error patent.
The second and third errors patent concern the defendant’s sentences for forcible rape (count 1, La. R.S. 14:42.1) and second degree kidnapping (count 3, La. R.S. 14:44.1). The sentences are illegal because they do not contain a provision as to the length of the sentences which are to be served without benefit of parole, probation and suspension of sentence. La. R.S. 14:42.1B and La. R.S. 14:44.1C mandate that “at least two years” of the sentence be imposed without benefits. Because the correction of these illegal sentences involves sentencing discretion, the sentences on those convictions cannot be corrected on appeal under La. R.S. 15:301.1(A). Therefore, the matter is remanded to the district court with instructions to vacate the forcible rape and second degree kidnapping sentences 11sand resentence in accordance with La. R.S. 14:42.1B and La. R.S. 14:44.1C. See State v. Tabor, 2007-0058 (La.App. 1 Cir. 6/8/07), 965 So.2d 427.
PRO SE ASSIGNMENT OF ERROR NUMBER 1
In his first pro se assignment, the defendant complains that the trial court erred by denying his motions for post-verdict judgment of acquittal and for new trial. He reasons that the evidence is insufficient to support his convictions.[4]
In addition, the defendant argues that he was denied his Sixth Amendment rights to confront or cross examine the analysts *269 who actually performed the DNA testing. He maintains that test results were testimonial statements that should be excluded from trial as inadmissible hearsay. We address this issue in Pro Se Assignment of Error Number 4.
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
 It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. The determination of credibility is a question of fact within the sound | ^discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
A review of the evidence presented at trial, viewed under the Jackson standard, is sufficient to support all of the elements of the three convictions as set forth herein.
Rape is defined as “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.” See La. R.S. 14:41.
Aggravated rape is defined in La. R.S. 14:42 in pertinent part as:
[A] rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
[[Image here]]
3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon
Forcible rape is non-consensual sexual intercourse “[w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.” La. R.S. 14:42.1.
Ms. Gina Pineda, the State’s expert in molecular biology and forensic DNA analysis, testified that Reliagene received samples from two cases from the NOPD. In each case, there was a known reference blood sample from each victim obtained during the rape examination and an unknown sample, a vaginal swab, from each of the rape kits from which the lab produced a full male profile from the sperm fractions in each of the cases. Comparison of the male profile produced from M.M.’s vaginal swab with the male profile extracted from N.S.’s vaginal swab [ 17proved identical, meaning that the sperm donor in M.M.’s rape was the same donor in N.S.’s rape.
Ms. Angela Delatte, the State’s other DNA expert, developed a DNA profile from the reference buccal swab taken from the defendant. Ms. Delatte compared her test results to those developed by Relia-gene and concluded that the defendant was the man who raped both M.M. and N.S. Ms. Delatte explained that the statistical probability that the DNA profile obtained by Reliagene and the male profile she developed from the defendant’s buccal swab would belong to anyone other than *270 the defendant was one in 8.46 quintillion in the African-American population.
While the defense is correct in its assertion that M.M. was unable to identify her armed rapist, N.S. identified the defendant at trial as the man who kidnapped and raped her at gunpoint. N.S.’s eyewitness identification of the defendant as her rapist coupled with the DNA profile positively identifying the defendant as both M.M.’s and N.S.’s rapist, plus the match between Reliagene’s test results to the profile produced by Ms. Delatte from the defendant’s buccal swab are further proof that the defendant was guilty of the forcible and aggravated rapes of M.M.
Second degree kidnapping, in pertinent part, is the forcible seizing and carrying of any person from one place to another, wherein the victim is imprisoned or kidnapped when the offender is armed with a dangerous weapon. La. R.S. 14:44.1(A)(5) & B(l).
The testimony of the victim alone is sufficient to establish the elements of the offense. State v. Robinson, 2008-0287, p. 8 (La.App. 4 Cir. 9/24/08), 996 So.2d 56, 60. M.M.’s unrefuted testimony established the elements of second degree kidnapping. She testified that the defendant broke into her residence | ^brandishing a gun. He blindfolded her and tied her hands behind her back to prevent her escape. He held her at gunpoint while he stole money, jewelry, and other valuables from her residence. The defendant moved M.M. from the living room to her bedroom, where he raped her several times at gunpoint. Moreover, M.M. testified that the defendant accompanied her to the bathroom and would not allow her to wipe herself. During the entire ordeal, the defendant restricted M.M.’s movements and imprisoned her at gunpoint in her home. Cf. State v. Berry 99-0001 (La.5/7/99), 735 So.2d 618, 619 (per curiam) (evidence satisfied verdict of second degree kidnapping where armed perpetrators forcibly secreted the victims inside their own home, La. R.S. 14:44.1(A)(5) and (B)(3)).
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the State proved the defendant guilty of the aggravated rape, forcible rape and second degree kidnapping of M.M. A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. This assignment has no merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 2
By this assignment, the defendant argues the trial court erred by denying his motion for new trial based on the assertion that the State withheld M.M.’s medical records.
At the July 23, 2012, Prieur hearing in this case, defense counsel complained that the defense had not been provided copies of M.M.’s medical records pertaining to her November 1999 rape. Responding to the trial judge’s question about the production of the medical record, the prosecutor responded:
Prosecutor:
|ia... Now the reports I have have nothing to do with this case. When they filed the subpoena duces tecum with University Hospital, apparently they provided our office with every time she went to University Hospital. It’s the State’s contention that it has nothing to do with this case. And again, I believe they were turned over anyway. If I have a redacted copy I’ll be happy to turn over another copy ...
Judge:
*271 But you’re saying, I guess the most crucial point in this matter is any medical evidence that you may have is not related to the incident involving the ... November '99 [rape]?
Prosecutor:
Correct, Judge.
The record indicates that the State did not have any relevant medical evidence and that whatever it had, it had already turned over to the defense. Moreover, the State did not introduce any of M.M.’s medical records at trial. This assignment has no merit.
COUNSELED ASSIGNMENT OF ERROR NUMBER 1
In this assignment, the defendant complains that the trial court erred by admitting prejudicial evidence of uncharged crimes — the aggravated rape of N.S. and the burglary of Ms. Magee’s residence — in violation of La. C.E. art. 404(B)(1).
Generally, courts may not admit evidence of other crimes, wrongs or acts of a criminal defendant in order to show that s/he is a person of bad character who has acted in conformity therewith. La. C.E. art. 404(B)(1). However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). Additionally, the State bears the burden of proving that the defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-_g849,20 p. 2 (La.1/10/03), 839 So.2d 932, 933, (per curiam),(citing State v. Prieur, 277 So.2d 126, 130 (La.1973)). Although a criminal defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. The probative value of the evidence must outweigh its prejudicial effect of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. Id.; Galliano, 2002-2849, at p. 3, 839 So.2d at 933. As used in the balancing test, “prejudicial” limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. State v. Germain, 433 So.2d 110, 118 (La.1983). The term “unfair prejudice,” as to a criminal defendant, speaks to the capacity of some con-cededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. State v. Rose, 2006-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1244 (citing Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)).
Evidence of not only convictions, but also unadjudicated acts committed by the defendant is admissible to show intent and motive. La.C.Cr.P. art. 404. A trial court’s ruling on the admissibility of evidence will not be overturned absent an abuse of discretion. State v. Wright, 2011-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316 (citing State v. Cosey, 1997-2020 (La.11/28/00), 779 So.2d 675, 684). This same standard is applied to rulings on the admission of other crimes evidence under La. C.E. art. 404(B)(1) and evidence under La. C.E. art. 412.2. Wright, supra.
La. C.E. art. 412.2, provides, in pertinent part:
|aiA. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the *272 offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
There is no question that the State filed a Prieur notice and that a hearing was held. To its notice, the State attached the NOPD reports concerning the two prior incidents the State intended to present. Thus, the defendant received adequate notice of the nature of the evidence that the State intended to introduce.[5]
In this case, the other crimes evidence proved method, manner, plan, location and display of modus operandi. Moreover, the other crimes evidence was presented in an orderly manner, and clearly and succinctly through the testimony of the victims. Each victim testified cogently and in detail as to her experiences. Their testimony showed that the crimes occurred in temporal proximity. M.M. was raped in November 1999; N.S. testified that she was raped in December 1999; and Ms. Magee said that her home was burglarized in February 2000. The rapes occurred in close radius of one other — .8 miles, and the burglary was committed only .9 miles away from the 2200 block of Port Street. Both M.M. and the defendant resided in the 2200 block of Port Street at the time of the attack. Both M.M. and N.S. were blindfolded and raped at gunpoint. Similar to M.M.’s rape, the defendant broke into and burglarized the Magee residence late at night and stole valuables at gunpoint. The evidence of the rape and burglary was probative in the context of the defendant’s modus operandi and intent. During the ^commission of the rapes, the defendant blindfolded the victims and raped and robbed them at gunpoint. The defendant committed the burglary late at night by breaking into the residence and robbing the victim at gunpoint. The time span between the crimes was just three months, and they occurred within a one mile radius of the defendant’s residence. Detective Jackson’s testimony matched the fingerprints taken from the burglary to the defendant’s fingerprints taken prior to trial.
Even assuming the admission of the other crimes evidence was improper, which it was not, the erroneous admission of other crimes evidence is subject to harmless error analysis. Harmless error exists where the guilty verdict actually rendered was “surely unattributable” to the error. State v. Higginbotham, 2011-0564, p. 3 (La.5/6/11), 60 So.3d 621, 623.
The proof of the defendant’s guilt in this case included scientific evidence. The un-controverted DNA analysis proved that the defendant’s semen was found in M.M.’s vagina. Consequently, any possible error in admitting the other crimes evidence was harmless. This assignment has no merit.
COUNSELED ASSIGNMENT OF ERROR NUMBER 3[6]
By this third counseled assignment, the defendant submits that the trial court erred in refusing to suppress the results of DNA sampling obtained on a *273 buccal swab/blood sample[7] taken from him in 2006, while he was imprisoned in the Georgia Department of Corrections. He complains that his Fourth Amendment 1 aright to be free from unreasonable searches and seizures was violated by the Georgia testing.
At the July 23, 2012, hearing on pre-trial motions, defense counsel argued:
There was no case pending against [the defendant] when this happened. He was just in the Department of Corrections and they decided to just, I guess, swab the people that were incarcerated. There was no warrant for his arrest until 2010. So there was no pending case. It was just a swab taken for, I guess the Department of Corrections to log in the DNA of people that were incarcerated ... we’re saying that it was a violation ... if there was a pending case and he was a suspect ... then maybe it makes sense to get the DNA. But to just take people’s DNA randomly and store it somewhere on the chance that at some point in time, in the near future or any time in the future, they may have committed a crime ... is a violation of his constitutional rights.
The Louisiana Supreme Court considered this issue in State v. Franklin, 2011-1909 (La.12/16/11), 76 So.3d 423 and determined that taking DNA samples from ar-restees is not a search that must be supported by probable cause.
The collection of DNA from persons arrested and charged with a crime but not convicted is now a matter of comprehensive federal and state regulation, which authorize the taking of a DNA sample from arrestees and pre-trial detainees in the same routine manner as the taking of fingerprints and photographs, to identify the person by means of “an accurate, unique, identifying marker-in other words, as fingerprints for the twenty-first century.” United States v. Mitchell, 652 F.3d 387, 410 (3rd Cir.2011) (upholding the constitutionality of 42 U.S.C. § 14135a(a), authorizing the warrantless collection of a DNA sample from persons who are arrested, facing charges, or convicted, and regulations by the Attorney General mandating collection of the sample, see 28 C.F.R. § 28.12(b)(2009)(“Any agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples from individuals who are arrested, facing charges, or convicted.”) and 28 C.F.R. § 28.12(f)(2)(2009) (each agency required to collect the sample shall furnish the sample to the F.B.I. “for purposes of analysis and entry of the results of the analysis into the Combined DNA Index System.”)); see also La. R.S. 15:609(A)(1)(“A person who is arrested for a felony or other specified offense ... shall have a DNA sample drawn or taken at the same time he is fingerprinted pursuant to the booking procedure.”); La. R.S. 15:605 (establishing a state DNA data base administered by the state police to “provide DNA records to the FBI for storage and maintenance by CODIS [Combined DNA Index System].”); La. R.S. 15:612(C) (“The state police may create a separate population data base comprised of DNA samples obtained under this Chapter after all personal identification is removed.... pThe population data base may be made available to and searched by other *274 agencies participating in the CODIS system.”); cf. State v. O’Hagen, 189 N.J. 140, 914 A.2d 267, 280 (2007)(“We harbor no doubt that the taking of a buccal cheek swab is a very minor physical intrusion upon the person.... no more intrusive than the fingerprint procedure and the taking of one’s photograph that a person must already undergo as part of the normal arrest process”).
Id,., 2011-1909, p. 2-3, 76 So.3d at 424, 425.
Moreover, in Padgett v. Donald, 401 F.3d 1273 (11th Cir.2005), the court considered the Georgia offender DNA statute (O.C.G.A. § 24-4-60)[8], which allows the Georgia Department of Corrections to obtain an incarcerated felon’s DNA sample by taking blood, swabbing the inside of his mouth for saliva, or using any other noninvasive procedure for analysis and storage in a data bank maintained by the Georgia Bureau of Investigation, and held that the extraction of saliva from incarcerated felons under O.C.G.A. § 24-4-60 does not violate either |2sthe Fourth Amendment’s prohibition against unreasonable searches and seizures or a prisoner’s right to privacy. Padgett, 401 F.3d at 1275.
The Padgett court first concluded that the “extraction of saliva itself does not *275 implicate [a prisoner’s] interests in avoiding disclosure of information, but rather ‘the right of the individual to be free in his private affairs from governmental ... intrusion.’ ” Padgett, 401 F.3d at 1281 (quoting Whalen v. Roe, 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). Employing a balancing test “weighing the degree to which the search intrudes on an individual’s privacy against the degree to which it promotes a legitimate governmental interest,” id. at 1280 (citing United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 592, 151 L.Ed.2d 497 (2001)), the court found the Georgia statute constitutional under both the federal and Georgia State Constitutions because “Georgia’s legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involved in taking prisoners’ saliva samples and storing their DNA profiles, given prisoners’ reduced expectation of privacy in their identities!)]” Id. The Padgett court explained that while prisoners retain certain fundamental rights to privacy, the right claimed in Pad-gett “is neither ‘fundamental’ nor ‘implicit in the concept of ordered liberty.’ ” Id. (iquoting Roe v. Wade, 410 U.S. at 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). The court further noted that prisoners “must undergo routine tests of their blood, hair, urine, or saliva for drugs.” Id. at 1278. This and the other restrictions on prisoners’ freedom are inherent to their status as prisoners and suggest that the right claimed in connection with the extraction of saliva is not protected by the right to privacy. Id. See also, Hamilton v. Brown, 630 F.3d 889, 896-97 (9th Cir.2011) (blood draws are a routine fact of modern life and inmates “have been lawfully subject to much more severe intrusions of their lgficorporeal privacy than a sterile blood draw conducted by a trained medical professional.”)
Fourth Amendment challenges to parallel state DNA-indexing statutes have met with similar results. See, e.g., Green v. Berge, 354 F.3d 675 (7th Cir.2004) (Wisconsin statute); Schlicher v.(NFN) Peters, I&I, 103 F.3d 940 (10th Cir.1996) (Kansas statute); Boling v. Romer, 101 F.3d 1336 (10th Cir.1996) (Colorado statute); Jones v. Murray, 962 F.2d 302 (4th Cir.1992) (Virginia statute).
This assignment is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 3
Defendant’s third pro se assignment charges prosecutorial misconduct during closing argument. The defendant complains that the prosecutor called him a “monster” and then noted: “It is very rare when you get to know when you’re in the presence of evil and you’re looking at him right here.”
At the outset, the court report certified that there were no objections lodged during closing arguments. As such, this issue has not been preserved for appellate review given the lack of a contemporaneous objection. La.C.Cr.P. art. 841 A. Nevertheless, prosecutors may not resort to argument involving personal experience or turn argument into a plebiscite on crime. State v. Fortune, 2010-0599, p. 8 (La.App. 4 Cir. 12/22/10), 54 So.3d 761, 766. Prosecutors, however, have wide latitude in choosing closing argument tactics. State v. Casey, 1999-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036. A trial court has broad discretion in controlling the scope of closing arguments. Casey, supra; State v. Jones, 2010-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833. Even when the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the|27jury and contributed *276 to the verdict. State v. Wiltz, 2008-1441, p. 6 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 558. Even when the prosecutor’s statements are improper, a reviewing court should accord credit to the good sense and fairmindedness of the jury that heard the evidence. State v. Harvey, 2008-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499.
This Court refused to grant a mistrial in State v. Henry, 2011-1137 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, writ denied 2012-2520 (La.4/26/13), 112 So.3d 838, in which the same epithet was used. During rebuttal argument, the prosecutor referred to the defendant as a “monster” and “a sexual predator.” This Court concluded:
Considering the totality of the facts and circumstances in the instant case, and according credit to the good sense and fairmindedness of the jury, it cannot be said that one would be thoroughly convinced that the rebuttal argument complained of improperly influenced the jury and contributed to the verdict. Thus, it cannot be said that the trial court abused its discretion in denying defendant’s motion for mistrial, implicitly determining that the comments by the prosecutor were not so prejudicial as to deprive defendant of his right to a fair trial.
Id.
In the instant case, the bulk of the state’s arguments were fair statements of the evidence admitted and the lack of evidence to corroborate the defense’s theory of the case. Reading the prosecutor’s argument as a whole, and considering the entirety of the record, nothing the defense argues indicates that these remarks so influenced the jury that they contributed to the verdict. Given the traditional breadth accorded the scope of closing arguments by this Court, neither of the comments would either individually (or collectively for that matter) merit reversing the defendant’s conviction and sentence. See State v. Bridgewater, 2000-1529, p. 33 (La.1/15/02), 823 So.2d 877, 903 (“animal” and “cold-blooded killerj^on the hunt for prey” did not contribute to the guilty verdict). Because the defendant has failed to show any reasonable likelihood that the argument influenced the verdict in this case, we find that this assignment has no merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 4
In the final pro se assignment, the defendant contends that the DNA evidence should have been excluded because the scientist/analyst who actually performed the testing did not testify at trial.
Ms. Gina Pineda testified that Reliagene received two cases (NOPD Item Nos. K-52439-99 and L-32758-99) for testing on August 4, 2003. K-52439-99 and L-32758-99 pertained to rapes which occurred in 1999. Ms. Pineda testified as to the DNA test results for both cases directly from Reliagene’s final reports, which were generated by entering the male profile into a computer generated statistical program. She further stated that while she did not perform the actual testing on the samples from the two cases, she supervised the testing performed by experienced analysts, drew final conclusions, interpreted the results and signed off on the analysts’ reports. Although the identity of the sperm donor in each case was unknown at the time of testing, Ms. Pineda reported that test results proved that the male profiles developed in each of the cases were identical-that the spenn donor in K-52439-99 and L-32758-99 was the same male. Those two unknown male profiles were uploaded to CODIS by the NOPD in 2004.
Ms. Angela Delatte from the Louisiana State Police Crime Lab testified that in 2006 she received and tested a buccal swab *277 taken from the defendant. Ms. Delatte isolated DNA from the swab and ran the results through an instrument which expressed the results in the form of peaks on a graph. The peaks were then entered into a computer program that generated numbers associated with those Rnpeaks and produced a DNA profile. She then compared the DNA profile produced from her testing on the defendant’s buccal swab with the results generated by Reliagene. She concluded that the DNA profile developed from the defendant’s buccal swab was a match with the DNA profile generated by Reliagene.
As the trial testimony proves, Ms. Pine-da supervised the testing performed by experienced analysts, drew final conclusions, interpreted the results and signed off on the analysts’ reports. Likewise, Ms. Delatte detailed the procedure she employed to extract the defendant’s DNA from the defendant’s buccal swab and explained how her test results matched those produced by Reliagene. The experts also explained the fail safe testing protocols employed to guard against human error; that the DNA profile was computer generated; and that the test results were accurate within a reasonable degree of scientific certainty. The experts testified at length about the uniform testing protocol, the exhaustive re-testing of lab findings and peer review of test results. Finally, the State’s experts’ uncontroverted testimony informed the jury that any trained scientist could review the raw data in this case and render an opinion.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354,158 L.Ed.2d 177 (2004), the Supreme Court held that the confrontation clause of the Sixth Amendment acts as an absolute bar to the admission of all out-of-court testimonial evidence unless (1) the witness who made the statement is unavailable to testify in court, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 68, 124 S.Ct. at 1374. The hearsay the Court found testimonial in Crawford was a recorded statement given by the defendant’s wife to police after she had been advised of her Miranda rights. The statement was introduced by the State to rebut the defendant’s claim of self-defense in a stabbing case in which he was charged lanwith assault and attempted murder. The defendant and his wife were each interrogated twice by police. The wife did not testify because of the state marital privilege, and the defendant had no other opportunity to cross examine her. The Court in Crawford left “for another day any effort to spell out a comprehensive definition of ‘testimonial’.” 541 U.S. at 68, 124 S.Ct. at 1374.
According to Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), an analyst’s report and certification regarding forensic evidence is considered a testimonial statement and is subject to confrontation clause requirements. Furthermore, if the report and certification are presented as evidence, then the person called for testimony and cross-examination on the evidence must have conducted or observed the tests on which the report and certification are based. Bullcoming v. New Mexico, — U.S.-, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).
Recently, in State v. Grimes, 2011-0984 (La.App. 4 Cir. 2/20/13), 109 So.3d 1007, this Court performed an analysis of Bull-coming, supra in light of Williams v. Illinois, 567 U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). Williams involved the prosecution and conviction of a defendant in Chicago for aggravated criminal sexual assault (rape), aggravated kidnapping, and aggravated robbery, all committed against a single victim in February 2000. The *278 perpetrator was unknown at the time. A sexual assault kit was collected from the victim during a post-rape examination. Vaginal swabs from the kit were sent by the Illinois State Police (ISP) crime lab to a private lab, which sent back a report containing a male DNA profile. Meanwhile, a DNA profile had been produced by the ISP crime lab from a blood sample taken from the defendant after his August 2000 arrest on unrelated charges. After receipt of the DNA profile extracted by the | private lab from the vaginal swabs taken from the rape victim, a computer search by the ISP crime lab produced a match between that DNA profile and the known DNA profile of the defendant. The victim subsequently identified the defendant in a lineup as her attacker, and he was arrested. Also, the victim testified and identified the defendant in court as her attacker.
Three forensic witnesses testified for the State in Williams. An ISP forensic scientist testified that he had confirmed the presence of semen on the vaginal swabs taken from the victim and afterward had resealed the evidence and left it in a secure freezer at the ISP lab. A state forensic analyst testified that she had developed a DNA profile from the blood sample drawn from the defendant after his unrelated August 2000 arrest and that she had entered that DNA profile into the state forensic database. Finally, a DNA expert testified that the male DNA profile produced by the private lab from vaginal swabs taken from the rape victim matched the male DNA profile produced from the sample of the defendant’s blood. At the time the private lab sent its DNA report to the state police lab, the defendant was not a suspect in the February 2000 sexual assault, kidnapping and robbery.
In Grimes, Supra, this Court noted:
The U.S. Supreme Court framed the issue presented in Williams as whether Crawford “bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify[.]” Williams, — U.S. at-, 132 S.Ct. at 2227. The Court held that “this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.” Williams, — U.S. at -, 132 S.Ct. at 2228. Williams stated that its conclusion was entirely consistent with Bullcoming and Melendez-Diaz, explaining:
In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of |32what they ásserted: in Bullcoming that the defendant’s blood alcohol level exceeded the legal limit and in Melendez-Diaz that the substance in question contained cocaine. Nothing comparable happened here. In this case, the Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator’s DNA but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner’s blood.... The relevance of the match was then established by independent circumstantial evidence showing that the Cellmark report was based on a forensic sample taken from the scene of *279 the crime. Williams, — U.S. at-, 132 S.Ct. at 2240-2241.
Grimes, 2011-0984 at p. 25, 109 So.3d at 1021.
Although the forensic report in Williams was not introduced into evidence, but was in Bullcoming and this case, the Court in Williams set forth “a second, independent basis” for its decision, holding that “[e]ven if the report produced by Cell-mark had been admitted into evidence, there would have been no Confrontation Clause violation.” Williams, — U.S. at -, 132 S.Ct. at 2228. The Court explained:
The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cell-mark provided was not inherently incul-patory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See Perry v. New Hampshire, 565 U.S.-, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

Id.

IssThe Court in Williams also distinguished the forensic reports at issue in Bullcoming and Melendez-Diaz, which it had held qualified as testimonial statements. The Court noted:
Introduction of the reports in those eases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial ... The Cellmark report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual....

Id.

Thus, under Williams, even if forensic DNA reports are admitted in evidence without in-court testimony of the scientist/analyst who either signed the certification or performed or observed the test reported in the certification (see Bullcom-ing ), generally, there is no Sixth Amendment Confrontation Clause violation because the reports are not testimonial. Grimes, Supra.
In State v. Bolden, 11-237 (La.App. 3 Cir. 10/5/11), 103 So.3d 377, a case of aggravated rape, the State’s DNA expert testified, over defendant’s objection, that the DNA profile, developed from a blood sample taken from the defendant, matched the DNA profile developed by other technicians, who did not testify at trial, from biological samples taken from the victims after they were sexually assaulted. The samples were taken from the victims nearly ten years before a search of the CODIS *280 data base identified the defendant as the donor of the samples. One profile was developed by the Acadiana Criminalistics Laboratory, the other by a private laboratory in Tennessee under contract with Acadiana to test the sample using the same testing protocols and computer software. The results of the victims’ tests were used as a basis of comparison with the defendant’s DNA profile, but the reports themselves were not introduced into evidence under the provisions of La. R.S. 15:499 (certificates of criminalistics laboratories). The |,^appellate court ruled, inter alia, that the trial court erred in allowing the State to use the results of the DNA tests at trial without producing the individuals who conducted the tests for confrontation and cross-examination. Accordingly, the court of appeal reversed defendant’s convictions and sentences and ordered him discharged from custody. However, on review, the Louisiana Supreme Court reversed the Third Circuit on the basis of Williams, supra. See State v. Bolden, 2011-2485 (La.10/26/12), 108 So.3d 1159. The Court found:
No error under the Confrontation Clause occurs when a DNA expert testifies-that in his or her opinion the DNA profile developed from a sample taken from defendant matches the DNA profile developed by other, nontestifying technicians from biological samples taken from the victim of a sexual assault if: the tests on the victim’s samples were conducted before the defendant was identified as the assailant or targeted as a suspect, Williams, 567 U.S. at-, 132 S.Ct. at 2242-43.
Bolden, 2011-2435 at p. 4, 108 So.3d at 1162.
In addition to affirming the defendant’s conviction under Williams, the Louisiana Supreme Court in Bolden also stated:
In addition, as a matter of Louisiana law, the computer printouts of the profiles developed from the victims’ samples by the two laboratories using the same software did not constitute statements of a declarant for purposes of La. C.E. art. 801 (defining a statement as an oral or written assertion by a declarant, or “a person who makes a statement”), cf. State v. Armstead, 432 So.2d 837, 839 (La.1983) (distinguishing between computer stored human statements which are hearsay and computer generated statements which are nonhearsay), and the factual assertions made by the technicians that the profiles related to the specific samples delivered to the laboratories were admissible despite their hearsay character under the business or public records exceptions to the hearsay rule in La. C.E. art. 803(6) and 803(8). Cf. Williams, 567 U.S. at-, 132 S.Ct. at 2249 (Breyer, J., concurring) (“Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades.”) (citing Fed. Rule Evid. 803(6) (“Records of Regularly Conducted Activities”); 2 J. Wigmore, Evidence §§ 1517-1533, pp. 1878-1899 (“Regular Entries”)).
Bolden, 2011-2435, Supra at p. 4, 108 So.3d at 1162.
| saApplying to the facts of this case, the holdings in Williams, supra, and Bolden, Supra, the record shows that the State’s expert witnesses’ testimony and the DNA report compiled by Reliagene were not testimonial evidence as “this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion *281 rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.” Williams, — U.S. at -, 182 S.Ct. at 2228. The report in this case was compiled by Reliagene, an accredited laboratory, which tested the evidence obtained from the victim’s rape exam kit and rendered a report on its findings. The State’s experts, Ms. Pineda and Ms. Delatte, testified that each reviewed the laboratory report, prior to, and at trial, and deemed the findings accurate. The experts guided the jury through the raw data upon which the testing was based and explained precisely how the male DNA profile was extracted from that data. The DNA report was not prepared for the primary purpose of accusing the defendant as a suspect in the rapes. The victims’ rape kit samples were collected in 1999, tested in 2003 and uploaded to the State’s CODIS data base in 2004. In 2006, the Louisiana State Police Crime Lab discovered that the male DNA profiles from Reliagene’s testing matched each other and alerted the NOPD. All of the foregoing actions occurred before the defendant herein was identified as the victims’ assailant or targeted as a suspect. The primary purpose of the testing was not to target a specific or known suspect, as in Bullcom-ing and Melendez-Diaz, but rather to catch an unknown rapist. Williams, 567 U.S. at-, 132 S.Ct. at 2248-49. Accordingly, for the foregoing reasons, this assignment has no merit.
| .^COUNSELED ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant argues that Louisiana Constitution Art. I, § 17 A and La.C.Cr.P. art. 782(A), that allow for non-unanimous jury verdicts, violate the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment because racial animus was the motivating factor in Louisiana’s introduction and first-time adoption of the non-unanimous jury provisions in 1898.[9]
In this case, at the hearing on the issue on July 23, 2012, the defense advised the trial court it was “challenging the constitutionality of Louisiana’s law around non-unanimous jury[s] in these types of cases.” The trial judge responded: “And the matter has been upheld by the Supreme Court ... your motion is denied.” Defense counsel objected to the denial of the motion.
The defendant herein was convicted of aggravated rape (La. R.S. 14:42), forcible rape (La. R.S. 14:42.1), and second degree kidnapping (La. R.S. 14:44.1). The jury’s votes on those convictions were 10-2, 11-1, and 11-1, respectively.
La. Const. Art. I, § 17 provides, in pertinent part:
(A) Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.
La.C.Cr.P. art. 782 essentially tracks La. Const, art. I, § 17(A), and states, in pertinent part:
1S7A.... Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict ...
*282 It is not disputed that one product of the Louisiana Constitution of 1898 was the enactment of Article 116 of the Constitution of 1898, which, for the first time in Louisiana, provided for non-unanimous jury verdicts in non-capital felony cases, which provision is presently contained in La. Const, art. I, § 17(A) and La.C.Cr.P. art. 782(A). Art. 116 stated:
The General Assembly shall provide for the selection of competent and intelligent jurors. All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, which shall not be prior to 1904, be tried by the judge without a jury. Cases in which the punishment may be at hard labor shall be tried by a jury of five, all of whom must concur to render a verdict; cases in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom concurring my render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict.
In support of his argument against the constitutionality of non-unanimous juries, the defendant in this case relies on Hunter v. Underwood, 471 U.S. 222, 227, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985), and [Village of] Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).
When analyzing a constitutional challenge to a statute, to determine whether the challenger has met his burden of proof, a three-step analysis is employed: unconstitutionality must be raised in the trial court; it must be specially pleaded; and the grounds outlining the basis of unconstitutionality must be particularized. See State v. Hatton, 2007-2377 (La.7/1/08), 985 So.2d 709, 718-20. “[T]he purpose of the three-step analysis for challenging the constitutionality of a statute is to give the parties an opportunity to brief and argue the constitutional grounds 13Sand to prepare an adequate record for review.” Id., 2007-2377, at p. 18, 985 So.2d at 721 (emphasis added).
Under these circumstances, the party asserting an Equal Protection Clause challenge must establish a racially disproportionate impact and a discriminatory motive on the part of the lawmaker. See Village of Arlington Heights, 429 U.S. at 265, 97 S.Ct. at 563. Once the party asserting unconstitutionality meets his initial burden, the burden of proof shifts to the other party to show that the same provision would have been enacted absent the established discriminatory intent. See Id., 429 U.S. at 270 n. 21, 97 S.Ct. at 566; see also Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).
For reasons which follow, the defendant has failed to meet his evidentiary burden of proving that either La. Const. art. I, § 17(A) or La.C.Cr.P. art. 782(A) is, or that Art. 116 of the Constitution of 1898 was, violative of the Equal Protection Clause.
In Hunter, Supra, the Court addressed whether a provision of the Alabama Constitution of 1901, providing for the disqualification from registration and voting of persons convicted of certain enumerated felonies and misdemeanors, including “any ... crime involving moral turpitude,” had been intentionally adopted to disenfranchise black Americans on account of race, as well as poor whites, and violated the Equal Protection Clause of the Fourteenth Amendment. The Court expressly noted in Hunter that the racially discriminatory impact of the constitutional provision was indisputable, citing expert testimony that by January 1903 the provision had disenfranchised approximately ten times as *283 many blacks as [^whites and that a disparate effect persisted to the present day— Hunter was decided in 1985.
The Court in Hunter relied on its earlier decision in Village of Arlington Heights, Supra, where the Court reversed an appeals court determination that a district court’s denial of a request for a zoning change to permit low income housing violated the Equal Protection Clause of the Fourteenth Amendment because the denial had racially discriminatory effects — the appeals court had approved the District Court’s finding that the denial had not been motivated by racial discrimination, but by a concern for integrity of the overall zoning plan. The Court held in Village of Arlington Heights that the respondents had “simply failed to carry their burden of proving that discriminatory purpose was a motivating factor” in the local governing authority’s denial of the request for the zoning change. The ultimate holding of the Court in Village of Arlington Heights was that official action will not be held unconstitutional solely because it results in a racially disproportionate impact — proof of racially discriminatory intent or purpose is also required to show a violation of the Equal Protection Clause.
The Court in Hunter stated that “[presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of Village of Arlington Heights to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment.” 471 U.S. at 226, 105 S.Ct. at 1920.
Thus, insofar as the instant case, under Hunter and Village of Arlington Heights, in order to establish that a facially neutral state constitutional provision or statute violates the Equal Protection Clause, a party must prove: (1) that the provision or statute produces disproportionate effects along racial lines; and (2) 140that racial discrimination was at the very least a motivating factor behind the enactment of the provision or statute. If the plaintiff or defendant meets that burden, the burden shifts “to the law’s defenders to demonstrate that the law would have been enacted without this [racially discriminatory] factor.” Hunter, 471 U.S. at 228, 105 S.Ct. at 1920.
In Hunter, aggrieved citizens sued the Montgomery and Jefferson County, Alabama Boards of Registrars under 42 U.S.C. §§ 1981 and 1983 for a declaration invalidating the particular Alabama constitutional provision. The case was certified as a class action, and it proceeded to trial. A registrar’s expert produced statistics at trial evidencing the indisputable racially discriminatory disenfranchising impact of the provision. The Court in Hunter noted that “[t]he evidence of legislative intent available to the courts below consisted of proceedings of the [1901 constitutional] convention, several historical studies, and the testimony of two expert historians.” 471 U.S. at 229, 105 S.Ct. at 1921.
In Village of Arlington Heights as well, the aggrieved citizens sued the local governing authority seeking declaratory and injunctive relief, and a trial was had at which evidence was introduced.
In this case, defendant’s case rests on one document, the Official Journal of the Constitutional Convention of the State of Louisiana (1898), and Hunter, supra, and Village of Arlington Heights, supra. There is no additional evidence, such as the testimony of an expert witness, for this court to review to determine whether defendant met his burden of proving either: (1) a racially discriminatory disparate impact; or (2) a racially discriminatory intent or purpose, both of which are required for a finding of an equal protection violation.
*284 |41 Nevertheless, considering the Official Journal of the Constitutional Convention of the State of Louisiana (1898), it is apparent that a motivating factor of the convention was the desire of Louisiana’s white Democratic oligarchy to disenfranchise both African-American and poor white citizens of this state. In his opening address to the convention, the president of the convention, E.B. Kruttschmitt, an attorney and delegate at large from Orleans Parish, stated as properly quoted and cited by defendant in his pretrial motion to declare La. Const, art. I, § 17(A) and La.C.Cr.P. art. 782(A) unconstitutional:
I am called upon to preside over what is little more than a family meeting of the Democratic party of the State of Louisiana ..., We know that this convention has been called together by the people of the State to eliminate from the electorate the mass of corrupt and illiterate voters who have during the last quarter of a century degraded our politics.
Official Journal of the Constitutional Convention of the State of Louisiana (1898), p. 9.[10]
In that opening address, the president of the convention stated that the suffrage question would be the first to come before the delegates, but that there were others of “minor importance when compared to that one which overshadows all,” and that under other circumstances those other questions would have been considered “questions of the first rank.” Id. at p. 10. The president stated that next to suffrage was the question of education, further stating that the question of |42“public education may rightfully be considered a corollary of the suffrage question,” and that the State owed it to all its citizens to say that “no man in the future shall complain that he has been deprived of the right to vote because of the poverty of himself or his parents.” Id.
The president of the 1898 convention stated that the next question after suffrage and education was the judiciary, noting that the question affected country parishes more than in the City of New Orleans, and stating that he trusted and believed that the delegates could come together and:
[S]hape a judiciary system which will relieve the parishes of the enormous burden of costs in criminal trials, and that we shall be able to present to the people of this State a judiciary system which shall be both efficient and economical.

Id.

In concluding his opening address, the president of the convention commented first on suffrage, then the judiciary, and lastly on education. As to the judiciary, his concluding remarks, in their entirety, were:
We owe it to the people of this State to say that in all of our tribunals any man accused of crime may obtain a speedy trial or speedy relief if he seeks the *285 protection of his rights in a civil action. ...

Id.

As for the enactment of Art. 116 of the 1898 Constitution, providing for a 9-3 non-unanimous jury verdicts in cases in which punishment was necessarily at hard labor (non-capital felony cases), defendant essentially argues that because of the anti-African-American animus permeating the convention, the only explanation for the change was racial discrimination.
While disenfranchisement was hailed as the primary purpose of the Louisiana Constitutional Convention of 1898, insofar as the judiciary, the stated | ^purpose of the convention was to relieve the parishes of the “enormous burden of costs in criminal trials,” shape a judiciary system that was “both efficient and economical,” and to provide for the right to a “speedy trial” for those charged with crimes and “speedy relief’ in civil cases. (Official Journal of the Louisiana Constitutional Convention of 1898, p. 10).
It is obvious that a 9-3 non-unanimous jury verdict — either for acquittal or conviction — is easier to come by than a unanimous verdict. Thus, the implementation of the 9-3 non-unanimous jury verdict would logically reduce the number of mistrials — and subsequent retrials — as compared to requiring unanimous jury verdicts in those eases. See Apodaca v. Oregon, 406 U.S. 404, 411, 92 S.Ct. 1628, 1633, 32 L.Ed.2d 184 (1972) (“Requiring unanimity would obviously produce hung juries in some situations where nonunanimous [sic] juries will convict or acquit.”) Reducing the number of mistrials and retrials would reduce costs of the criminal justice system, a stated goal of the convention. It would also generally result in speedier justice, also a stated goal of the convention.
Another fact to consider on the issue of an alleged discriminatory intent underlying the enactment of Art. 116’s 9-3 non-unanimous jury verdict system is that it is undisputed that the only other of the United States of America besides Louisiana that presently provides for non-unanimous jury verdicts is Oregon, which added its 10-2 non-unanimous jury verdict provision to Oregon Const, art. I, § 11 in 1934.
Legislative acts are presumed to be constitutional. State v. Bazile, 2011-2201, p. 6 (La.1/24/12), 85 So.3d 1, 4. Considering the totality of the facts and circumstances, the defense failed to meet its burden of proving unconstitutional purposeful discrimination on the basis of race in the enactment of the non-Junanimous44 jury verdict provision of Art. 116 of the Louisiana Constitution of 1898. The defendant cited no specific evidence in his trial court motion from which it can be concluded that non-unanimous verdicts actually resulted in a disparate impact on African-Americans in the years following the enactment of Art. 116 of the 1898 Constitution. It is recognized that, as a practical matter, such evidence likely would be difficult to compile. However, it remains defendant’s burden to prove a racially disparate impact. The defendant cannot rely on mere argument and historical documents referring to intentional disenfranchisement without expert testimony to tie the racial animus behind voting restrictions to a similar racial animus behind Article 116, specifically. State v. Hankton, 2012-0375 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028.
While the defendant in this case may have established racial motivation behind the 1898 constitutional provisions on voting, he has not established that every difference between the 1898 Constitution and the 1879 Constitution is the product of racial animus.
*286 In the disenfranchisement case of Hunter, insofar as proof of a disparate impact on African-Americans as a result of the 1901 Alabama constitutional provision at issue in that case, the registrars’ of voters expert testified not only to a racially disparate impact as of 1903, but also to a continuing disparate effect persisting at the time of the trial in Hunter, in the early to mid-1980’s. The defendant in this case produced no evidence of continuing disparate effect persisting at the time of his trial.
As noted in Hankton, supra:
The revision of a less-than-unanimous jury requirement in the 1974 Constitution was not by routine incorporation of the previous Constitution’s provisions; the new article was the subject of a fair 14Samount of debate. In that debate no mention was made of race. The stated purpose behind the latest iteration of the less-than-unanimous jury verdict provision is judicial efficiency. We also emphasize here that the 1974 Constitution was adopted by a vote of the people. And in that regard [the defendant] has not even suggested that an objectionable appeal on the basis of race was promoted to the public in order to obtain their consent to the revised less-than-unanimous jury verdict authorized by the 1974 Constitution.
Louisiana is not still using its 1898 Constitution, nor has Article 116 of the 1898 Constitution been adopted without change through the succeeding Constitutions. In our review of the legislative history of this challenged constitution provision, we have found that the general electorate of Louisiana did not vote on the approval of 1898, 1913, or 1927 Constitutions.
The last constitution that was approved by the people before the 1974 Constitution was in 1879. Both the 1913 and 1927 Constitutions reproduced nearly verbatim the provisions of Article 116 of the 1898 Constitution relating to less-than-unanimous jury verdicts. All other jury provisions, including the requirement that nine out of twelve jurors concur when the punishment is necessarily at hard labor, remained constant until the 1974 Constitution.
Louisiana’s 1973 Constitutional Convention debated the issue of less-than-unanimous jury verdicts when it changed the required number of jurors concurring from nine out of twelve to ten out of twelve, and nowhere in the discussion is race mentioned ...
Importantly, the initial proposal was not a restatement of the 1898 Constitutional provision, and the prior provision was not adopted by the new Constitution out of formality. The proposal extended the unanimity requirement, previously only applicable to capital cases, to eases, like [the defendant’s] that were necessarily punishable at hard labor for which parole or probation were unavailable. The delegates of the Constitutional Convention, therefore, contrary to [the defendant’s] assertion, expressly considered and rejected requiring unanimous jury verdicts in [the defendant’s] specific situation.
Id., 2012-0375, pp. 19-21, 122 So.3d 1028.
In this case, given that the defendant was tried in 2012 in Orleans Parish Criminal District Court by a jury composed of qualified Orleans Parish residents, and given that it can be judicially noticed that African-Americans have composed a solid majority of the population in Orleans Parish for at least several decades, it logically would be impossible for defendant to show a present-day disparate |4(iimpact due to the non-unanimous jury verdict provisions. Further, while it is not disputed that de *287 fendant was convicted by non-unanimous jury verdicts, the record does not reflect the racial makeup of the jury, much less a racial verdict.
Moreover, in State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the Louisiana Supreme Court effectively rejected the defendant’s argument that the use of non-unanimous jury verdicts has a disparate impact on minorities. The court noted that the defendant’s argument that the use of non-unanimous jury verdicts had an insidious racial component, allowed minority viewpoints to be ignored, and was likely to chill participation by the precise groups whose exclusion the United States Constitution has proscribed, had also been argued in Apodaea, supra, and a majority of the Court had determined that such argument was without merit.
The Court in Apodaea held that the use of non-unanimous jury trials in state criminal cases does not violate a defendant’s right to trial by jury under the Sixth and Fourteenth Amendments. The Court in McDonald v. City of Chicago, 561 U.S. 742,-, fn. 14, 130 S.Ct. 3020, 3035, fn. 14, 177 L.Ed.2d 894 (2010), recently affirmed the continuing viability of its holding in Apodaea that the use of non-unanimous juries in state criminal trials is not prohibited by the Sixth and Fourteenth Amendments. In fact, the McDonald Court stated: “The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials.” McDonald, 130 S.Ct. at 3035 n. 14 (emphasis supplied). Thus, the United States Supreme Court has effectively held that the use of non-unanimous juries does not have a discriminatory impact upon African-Americans |47and other minorities. This alone negates any argument that the use of non-unanimous jury verdicts violates the Equal Protection Clause.
The defendant has failed to meet his burden of proving either that La. Const. art. I § 17(A) or La.C.Cr.P. art. 782(A) is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, insofar as providing non-unanimous jury verdicts, or that his convictions by non-unanimous jury verdicts were similarly unconstitutional.
There is no merit to this assignment of error.
CONCLUSION
Based on the above and foregoing, we affirm the defendant’s conviction and sentence for aggravated rape (count 2); we affirm the defendant’s convictions for forcible rape (count .1) and second degree kidnapping (count 3) and remand to the trial court for clarification of the defendant’s sentences on those counts in accordance with La. R.S. 14:42. IB and La. R.S. 14:44.1C as discussed in the errors patent review.
AFFIRMED; REMANDED FOR RE-SENTENCING.

. The initials of the victims will be used in this opinion. See La. R.S. 46:1844(W)(bar-ring public disclosure of the names, addresses, or identities of crime victims under the age of eighteen years and of all victims of sex offenses, and authorizing use of initials, abbreviations, etc.).

. CODIS is an acronym for the combined DNA index system where criminals’ DNA is kept on record. The system was designed by the FBI and supplied to the state for identification of DNA samples.

. The State supplied the jurors with copies of the incident recall.

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).

. Prieur requires that, at the request of the defendant, the trial court give the jury a limiting instruction as to the limited purpose for the admission of the other crimes evidence, both prior to the admission of other crimes evidence and at the close of the trial. See also State v. Maise, 2000-1158 (La. 1/15/02), 805 So.2d 1141. The record does not indicate that the defendant made such a request.

. Counseled assignment of error number 2 will be addressed at the end of this opinion.

. In his appellate brief, the defendant asserts that DNA was obtained from a blood sample. However, there is no evidence of this assertion in the record. Nor is there evidence to support his contention during pre-trial motions hearings that the evidence was obtained from a buccal swab.

. Georgia Code of Evidence Title 24, § 24-4-60 provides:
(a) As used in this Code section, the term ‘state correctional facility’ means a penal institution under the jurisdiction of the Department of Corrections, including inmate work camps and inmate boot camps; provided, however, that such term shall not include a probation detention center, probation diversion center, or probation boot camp under the jurisdiction of the Department of Corrections.
(b) Any person convicted of a criminal offense defined in Code Section 16-6-1, relating to the offense of rape; Code Section 16-6-2, relating to the offense of sodomy or aggravated sodomy; Code Section 16-6-3, relating to the offense of statutory rape; Code Section 16-6-4, relating to the offense of child molestation or aggravated child molestation; Code Section 16-6-5, relating to the offense of enticing a child for indecent purposes; Code Section 16-6-5.1, relating to the offense of sexual assault against persons in custody, sexual assault against a person detained or a patient in a hospital or other institution, or sexual assault by a practitioner of psychotherapy against a patient; Code Section 16-6-6, relating to the offense of bestiality; Code Section 16-6-7, relating to the offense of necrophilia; or Code Section 16-6-22, relating to the offense of incest, shall have a sample of his or her blood, an oral swab, or a sample obtained from a noninvasive procedure taken for DNA (deoxyribonucleic acid) analysis to determine identification characteristics specific to the person. In addition, on and after July 1, 2000, any person convicted of a felony and incarcerated in a state correctional facility shall at the time of entering the prison system have a sample of his or her blood, an oral swab, or a sample obtained from a noninvasive procedure taken for DNA (deoxyribonucleic acid) analysis to determine identification characteristics specific to the person. The provisions and requirements of this Code section shall also apply to any person who has been convicted of a felony prior to July 1, 2000, and who currently is incarcerated in a state correctional facility in this state for such offense. The provisions and requirements of this Code section shall also apply to any person who has been convicted of a felony in this state on or after July 1, 2000, and who is incarcerated in a private correctional facility in this state for such offense pursuant to a contract with the Department of Corrections upon entering the facility, and for any person convicted of a felony prior to July 1, 2000, and who is incarcerated in a private correctional facility in this state pursuant to contract with the Department of Corrections. The analysis shall be performed by the Division of Forensic Sciences of the Georgia Bureau of Investigation. The division shall be authorized to contract with individuals or organizations for services to perform such analysis. The identification characteristics of the profile resulting from the DNA analysis shall be stored and maintained by the bureau in a DNA data bank and shall be made available only as provided in Code Section 24-4-63.

. See Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana, at 374 (Statement of Hon. Thomas J. Semmes). It was further proclaimed that the "mission was, in the first place, to establish the supremacy of the white race in this State to the extent to which it could be legally and constitutionally done.” Id. at 375.

. Interestingly, one of the primary historical authorities cited by defendant in his trial court motion, Lansza, Michael L., "Little More than a Family Matter: The Constitution of 1898,” In Search of Fundamental Law: Louisiana's Constitutions, 1812-1974, pp. 93-109 (Warren M. Billings & Edward F. Haas, eds.1993), states that laws that took effect on January 1, 1897, resulted in black voter registration falling from approximately 130,000 to nearly 13,000, and white registration falling from approximately 164,000 to 74,000, effectively disenfranchising black and poor white citizens prior to the 1898 convention. This fact is confirmed by two charts of registered voters, one as of January 1, 1897 and the other as of January 1, 1898, which are included in the Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana (1898), between pages 42 and 43.