Judge Regina Bartholomew-Woods
Appellant, Charles Carter, appeals the January 29, 2016 judgment of the district court finding him guilty of three counts of armed robbery with a firearm, attempted second degree murder, and second degree murder. For the reasons that follow, we affirm Defendant's convictions, but remand for resentencing in accordance with this opinion.
FACTUAL BACKGROUND
On September 30, 2012, New Orleans Police Department ("NOPD") Officer Tanya Watson responded to a report of a vehicle stolen in the 6300 block of Chef Menteur Highway in New Orleans. Officer Watson met with the victim, Mr. Ryan Cope, who reported his Ford pickup truck missing and executed a theft affidavit to that effect. Officer Watson obtained the truck's vehicle identification number and license plate and model numbers.
Detective Debrah Normand entered the information gathered by Officer Watson into the National Crime Information Center database, and Mr. Cope's truck was recovered on the evening of October 2, 2012, in the 7400 block of Dartmoor Street in New Orleans East. During her investigation, Detective Normand learned that Mr. Cope's truck had been used during a series of crimes - an armed robbery and simple burglary of a vehicle, both occurring in the 200 block of Bellaire Street. Fingerprints obtained from the SUV burglarized on Bellaire Street led to the development of Byron Johnson as a suspect in the theft of Mr. Cope's truck. Witnesses to the vehicle burglary on Bellaire Street observed Johnson and two other individuals fleeing the scene in the truck, which was ultimately identified by its license plate number as the truck stolen from Mr. Cope.
On the night of October 2, 2012, Derek McArthur drove his 2004 F-250 truck to New Orleans from Florida, checked into a hotel, and secured his truck in the hotel's parking lot. When Mr. McArthur awoke the following morning, he discovered his truck missing. The police recovered Mr. McArthur's truck on October 4, 2012. Fingerprints lifted from the truck, which were analyzed by an NOPD fingerprint expert, Officer George Jackson, matched Defendant and Devante Billy.
Christopher Becnel testified that on the night of October 2, 2012, at about 8:00 p.m., he drove into the driveway of his home in the 200 block of Bellaire Street.
*781 As Mr. Becnel prepared to exit his vehicle, he noticed an African American youth, between sixteen and twenty-one years of age, hiding behind a trash can. The youth stood up and, while brandishing a gun, charged Mr. Becnel's vehicle, and Mr. Becnel backed out of his driveway. The suspect fled on foot down the street. Mr. Becnel pursued the suspect and observed an armed robbery of his neighbor, Ms. Mary Cowan, in progress on Bellaire Street. The suspect that Mr. Becnel was following yelled and motioned to the two suspects robbing Ms. Cowan, and all of the suspects fled in a white truck parked in the 100 block of Bellaire Street. As the three suspects fled, Ms. Cowan told Mr. Becnel that she and her daughter had just been robbed at gunpoint. Mr. Becnel continued to pursue the fleeing suspects. During the chase, the suspects' truck was involved in a hit and run collision on Metairie Road. After that collision, the truck proceeded on Metairie Road in the direction of City Park Avenue, where it hit another vehicle and then entered the westbound lane of the I-10 at Metairie Road. Mr. Becnel lost sight of the truck and returned to alert his wife, Toni Ann Becnel, to the incidents. In the days following the incidents, Mr. Becnel viewed a photographic lineup from which he identified Byron Johnson as the youth who pointed a gun at him. Mr. Becnel testified that the suspect was not involved in the armed robbery of Ms. Cowan.
Mrs. Becnel testified that after hearing the commotion on Bellaire Street, she examined her SUV and found one of its doors ajar and the contents of the vehicle tossed about. The glove box had been rifled through and its contents strewn everywhere. Mrs. Becnel's credit card was missing. She denied knowing Byron Johnson or the Defendant.
Detective Kristie Harper investigated the burglary of Mrs. Becnel's SUV. When she arrived on the scene, Mr. Becnel described what happened. A crime technician dusted the interior and exterior of the SUV and lifted thirteen prints, six of which were identified as matching Byron Johnson. In investigating the burglary of the SUV, Detective Harper learned of the armed robbery that occurred on the same night in the same area. Further, she learned that the armed robbery suspects and the suspect in the SUV burglary fled the scene together in the white Ford truck stolen from Mr. Cope. Detective Harper was present when police located Mr. Cope's stolen truck parked in the 7400 block of Dartmoor Street. She knew that a check bearing Ms. Cowan's name was found in the vehicle. Byron Johnson was not a suspect in the armed robbery of Ms. Cowan because Mr. Becnel's testimony placed him at the Becnel home burglarizing Mrs. Becnel's SUV at the time Ms. Cowan was robbed.
Certified Latent Prints Examiner Officer George Jackson examined the fingerprints lifted from Mrs. Becnel's SUV. He ran the fingerprints in the Automated Fingerprint Identification System (AFIS), which indicated a match to Byron Johnson.
On the night of October 2, 2012, Ms. Mary Cowan recalled dining with friends and family members. When she returned to her home in the 200 block of Bellaire Street, she exited the front passenger seat of her sister's car and noticed someone to her right running down the sidewalk away from her. Right after that, she observed two males running toward her. One of the men was armed and demanded all of her belongings. Ms. Cowan testified that the person she initially noticed running down the street was different from the two men who robbed her, but that the three men left the area together in the same truck.
*782 Her neighbor, Mr. Becnel, pursued the suspects in his vehicle. The suspects took Ms. Cowan's purse when they fled. Ms. Cowan described one of her assailants as a slightly built, teen-aged, light-skinned black male, approximately five feet, nine inches tall with his hair in twists. In the ensuing days, Ms. Cowan viewed three six-person photographic lineups, but did not identify anyone from those lineups. In March 2013, Ms. Cowan met with Detective Kristen Krzemieniecki, who showed her a fourth photo lineup, from which Ms. Cowan identified the Defendant as the unarmed robber, who pulled her purse from her on the night of October 2, 2012. Ms. Cowan's purse and wallet were eventually returned to her, but their contents, including her credit card, were missing.
Detective Krzemieniecki learned other officers believed the truck owned by Mr. Cope was used in both the Bellaire Street burglary of Mrs. Becnel's SUV and the armed robbery of Ms. Cowan on the night of October 2, 2012. Detective Krzemieniecki identified a surveillance video recorded at 7400 Dartmoor Street on October 4, 2012, in which the stolen trucks owned by Mr. Cope and Mr. McArthur are depicted.
On the evening of October 2, 2012, Officer Walter Edmond was in the general area of Louisiana Avenue and Camp Street when he heard gunfire. Officer Edmond canvassed the area, and as he neared the intersection of Delachaise and Camp Streets, he heard screaming. Officer Edmond found Sanford Kaynor shot in the chest, lying in the driveway of his Camp Street residence. Mr. Kaynor told Officer Edmond that black males shot him and stole his vehicle. Officer Edmond relayed that information to Sergeant Jonathan Bulling. Sgt. Bulling assisted in processing the scene and collecting evidence.
Detective Krzemieniecki was the lead detective in the investigation of the attempted second degree murder and armed robbery of Mr. Kaynor. The Defendant was developed as a suspect through DNA evidence collected from a black and white bandana discovered on the scene and from fingerprints recovered from Mr. Kaynor's stolen vehicle.
Grace Kaynor recounted that on the evening of October 2, 2012, she, her husband, and eight-year-old daughter were home at their Camp Street residence. Mrs. Kaynor retired about 9:00 p.m., leaving her husband and daughter watching television downstairs. She awoke to two policemen telling her that her husband had been shot in the driveway. She ran outside and found him lying on the ground in terrible pain. To comfort him she told him everything was going to be okay. He responded: "No, it's never going to be all right. I can't feel my legs." When she attempted to find her driver's license, she realized someone had been in her house because her purse, wallet, house and car keys, and cellphone were missing from their usual place in the kitchen. At the same time, she noticed that her husband's computer and her daughter's iPad were gone. She noticed the kitchen door had been unlocked as a result of her husband having gone outside to his car.
Mrs. Kaynor accompanied her husband to the hospital where doctors told her he likely would not live through the night because of the gunshot wounds. In the days following the shooting, her husband was in and out of a coma and underwent several surgeries. Mrs. Kaynor kept a diary of things her husband told her while he was hospitalized. He told her three black males, who were fifteen or sixteen years old, approached him and two of the robbers were armed with handguns. One of the three perpetrators wore a mask and the other two waited for the third to arrive. Eight days after being shot, Mr. Kaynor *783 suffered a massive brain hemorrhage, leaving him paralyzed, unable to speak and brain damaged.
On October 4, 2012, the police searched Byron Johnson's 8841 Gervais Street residence and recovered Defendant's fingerprints in relation to the theft of Derek McArthur's truck, Ms. Cowan's debit card, and the cell phone stolen from the Kaynor residence.
Detective Krzemieniecki was recalled by the State to testify about her investigation of the armed robbery, attempted murder and aggravated burglary of Mr. Kaynor. Her investigation began with reviewing the initial report of the incident and speaking with Mrs. Kaynor. Detective Krzemieniecki learned that Mrs. Kaynor's purse, cell phone, wallet, vehicle keys, laptop, iPad and camera were stolen from the Kaynor residence the night Mr. Kaynor was shot.
On October 4, 2012, Detective Krzemieniecki discovered that the armed robberies of Mr. Kaynor and Ms. Cowan were related when she was notified the police were executing a search warrant at Byron Johnson's residence in New Orleans East. Detective Krzemieniecki participated in the search, during which officers located an identification and credit cards belonging to Ms. Cowan and a digital camera and a laptop computer taken from the Kaynor residence.
On October 5, 2012, Detective Krzemieniecki returned to canvas the area around Byron Johnson's residence. Within a few blocks, Detective Krzemieniecki found insurance paperwork on the Cadillac and Mercedes-Benz vehicles belonging to Mr. Kaynor. Around this same time, Mr. Kaynor's stolen Cadillac was located pursuant to a call reporting an abandoned vehicle at an apartment complex at 8019 Trapier Street. Processing of the vehicle yielded Defendant's fingerprints. Supported by a Combined DNA Index System ("CODIS") hit on the black and white bandana recovered from the Kaynor crime scene, Detective Krzemieniecki obtained search warrants for DNA samples from Defendant and Byron Johnson. Testing identified the presence of DNA from both Defendant and Byron Johnson on the bandana.
On October 6, 2012, police recovered Mr. Kaynor's stolen Cadillac. Sergeant Troy Dickerson of the NOPD Forensic Investigative Unit processed the vehicle for fingerprints and DNA evidence by swabbing the vehicle. Sgt. Dickerson lifted finger and palm prints, which were examined by Officer Joseph Pollard and compared with Defendant's prints. Officer Pollard's examination of the palm print lifted from the driver's side interior door handle indicated a match to Defendant.
Louisiana State Police Crime Lab Forensic DNA Analyst Rhalie Austin examined the DNA sample lifted from the black and white bandana recovered from the Kaynor residence. Ms. Austin compared the DNA sample from the bandana to Defendant's DNA and the DNA belonging to Byron Johnson. She concluded that neither Defendant nor Byron Johnson could be excluded as contributors of the DNA found on the bandana. Ms. Austin further testified that the odds of finding the same DNA profile of a random individual other than Defendant or Byron Johnson on that bandana were one in 1.77 million.
NOPD firearms identification expert Meredith Acosta tested two spent shell casings related to the Kaynor investigation. Ms. Acosta's analysis determined the shell casings were .9 millimeter caliber and were fired by the same weapon.
On October 19, 2012, Detective Bronson Gettridge responded to a report of a shooting in the 7800 block of Burke Avenue in New Orleans East. When he arrived on *784 the scene, Detective Gettridge observed a small car parked in the middle of the street. The driver's side window was shattered and both front doors were open. A non-responsive male victim, identified as Valon May, was in the front seat of the car with an apparent gunshot wound to the right side of the head.
Multiple pieces of evidence were recovered from the scene. Three or four bullet casings, which were found inside the vehicle, were submitted for ballistics testing. Crime technicians located an open wallet and baseball hat on the floor of the driver's side of the vehicle. The hat was submitted to the State Police Crime Lab for DNA testing, which revealed the presence of Devante Billy's DNA. The NOPD crime lab lifted five or six fingerprints from the victim's car which matched those of Defendant.
Tasia Williams testified that she and Mr. May were friends and that on the day he died, he gave her a ride to a friend's house. As Mr. May drove, he received a call from "Yanny," asking him to meet her on Burke Avenue. Ms. Williams told him she feared for his safety and asked him not to meet Yanny. Detective Darryl Doucette was assigned to investigate the victim's murder, and Ms. Williams met with Detective Doucette the day after the victim was killed. She told Detective Doucette that Yanny called Mr. May while she was with him.
Mr. May's cellphone records indicated he did, in fact, receive phone calls approximately thirty minutes prior to the shooting from two individuals, Aalilyah Cobb and Marvielle "Yanny" Smith. However, both denied having any knowledge of the shooting, and denied making any phone calls. Detective Doucette reviewed Ms. Smith's social media postings, and learned that Devante "Tae Banga" Billy and Defendant, Charles "Chuck" Carter, were two of her associates. Upon uncovering the foregoing information, Detective Doucette once again interviewed Ms. Smith and Ms. Cobb, both of whom implicated "Tae" and "Chuck" in the murder and armed robbery of Mr. May. Ms. Smith identified Defendant from a confirmation photo presented by Detective Doucette. Ms. Cobb told Detective Doucette that she saw Devante Billy fleeing the scene armed with a gun, and Defendant running from the victim's car carrying a GPS device. Detective Doucette verified the information supplied by Ms. Cobb through the recordings of Defendant's jailhouse calls, which implicated Devante Billy as the person who shot Mr. May and Defendant as the man who robbed him at gunpoint. During a third interview with Detective Doucette, Ms. Cobb and Ms. Smith viewed six-person lineups from which each identified Devante "Tae Banga" Billy as the shooter. Further, Ms. Cobb and Ms. Smith indicated that at the time of the shooting, Defendant was wearing an Oakland Raiders vest, black jeans and black and white Adidas tennis shoes.
Detective Doucette obtained an arrest warrant for Defendant and a warrant to search his residence. The search produced clothing as described by Ms. Cobb and Ms. Smith, a non-operational GPS device, consistent with the type stolen from the victim's vehicle, and one bullet which matched the type of ammunition used to shoot Mr. May.
Following Defendant's arrest, he gave a statement to Detective Doucette in which he admitted to having been present when Mr. May was shot. He explained that just prior to the shooting, he was talking to Mr. May about a marijuana purchase. He also stated that a female, unknown to him, was seated in the front passenger seat of the victim's car. As Mr. May spoke to Defendant, an individual named "Don Tavis"
*785 shot and robbed the victim. Detective Doucette testified that he was not able to locate anyone by the name of "Don Tavis," nor was there any evidence of anyone by that name linked to this case.
Ms. Smith testified that she was a friend of Mr. May and witnessed the shooting. Initially, she did not tell the police everything she knew because she feared retaliation from Devante "Tae Banga" Billy. She knew Defendant was one of "Tae's" friends.
Ms. Smith stated that she had known Mr. May for about two months prior to the murder. He would often drive her to wherever she wanted to go. On the night of the shooting, she met her friend, Ms. Cobb, in Algiers. They rode the bus to New Orleans East and met "Tae" and his friend, "Chuck" sometime between 6:00 and 7:00 p.m. and went to the baseball park. From there, she, Ms. Cobb, "Tae," "Chuck," "Ki Ki" and "Trey" walked to "Chuck's" house. Ms. Smith noticed that "Chuck" was carrying a gun in his pants. At some point in the evening, Ms. Smith called Mr. May, who was with Ms. Williams at the time, and asked him to drive her and Ms. Cobb to a party. When Mr. May arrived at "Chuck's" residence, he was alone. At the same time he arrived, Ms. Smith received a call from her boyfriend "Joker," who was incarcerated. She handed her phone to Ms. Cobb to talk to "Joker" because she did not want "Joker" to know she was with "Tae." Ms. Smith got into the front passenger seat of Mr. May's car, Ms. Cobb stood near the rear of the car, and "Chuck" walked to the driver's side door, pointed a gun at Mr. May and demanded money. Mr. May gave Defendant his wallet. As that happened, "Tae" got into the front seat and removed the GPS device from the car. He then walked to the back of the car and sat in the back seat. "Tae" asked Mr. May about money again, and Mr. May responded he had none. Defendant handed "Tae" the gun and told him to shoot Mr. May. "Tae" shot him in the back of the head while Ms. Cobb was standing at the rear of the victim's car speaking to "Joker" on a cell phone. Defendant grabbed Mr. May's cellphone. "Tae" handed the GPS device to Defendant, and they fled on foot. "Tae" brought the gun to a friend's house, and Defendant threw the GPS device over a fence. Because Ms. Smith and Ms. Cobb had witnessed the murder, "Tae" and Defendant refused to allow them to go home. The four proceeded to a party, and "Tae" told Ms. Smith that if the police spoke to her tell them Defendant had shot Mr. May.
On cross-examination, Ms. Smith admitted having a romantic relationship with "Tae" after the murder, but she explained she continued to see him because she feared he would kill her if he could not maintain some control over her. To further intimidate her, "Tae" told her that his brother killed a girl who was supposed to testify against "Tae."
Ms. Cobb testified that she knew Mr. May for about one year prior to his death. She witnessed his murder on Burke Avenue. She stated that she saw two suspects, one with a gun and the other carrying a GPS device, fleeing the scene after the shooting. Ms. Cobb spoke to the police a number of times, and at first, she did not tell the police about the murder. She denied being at the scene and denied knowing who committed the crime, but stated she did so out of fear for her safety. During another interview with Detective Doucette in her mother's presence, she told the detective she indeed witnessed the events as described above.
She recalled that, on October 19, 2012, she and Ms. Smith met "Tae" and "Chuck" for the first time that evening. They all went to a baseball game and then to *786 "Chuck's" house in New Orleans East. She and Ms. Smith intended to go to a party, but when it got late, Ms. Smith called Mr. May asking for a ride home. The victim met them on Burke Street, but before he arrived, Ms. Smith received a call from her boyfriend, "Joker." She took the call because Ms. Smith did not want "Joker" to know she was out with other boys. Mr. May drove up while she was speaking with "Joker," and Ms. Smith handed the phone to her. Ms. Smith approached the front passenger door, while "Chuck" approached the driver's side of the car. Someone got into the back seat, but she did not see who it was. She heard gunshots as she was speaking to "Joker," and saw "Chuck" and "Tae" running from the car. "Tae" had a gun in his hand and "Chuck" was carrying the victim's cellphone and a GPS device.
NOPD Crime Technician Shelita Hayes Benjamin photographed and processed the shooting scene for evidence. She retrieved an orange and black Mets cap, a black wallet containing a license and bank cards, and various business cards. She also recovered six latent fingerprints from the exterior of the driver's side door of the vehicle, four spent cartridge casings from the driver's seat and a receipt.
In October 2012, Sergeant Marc Boudreau was a firearms examiner with the NOPD Crime Lab. He determined that the four bullet casings retrieved at the shooting scene were fired by the same weapon, a .38 caliber semi-automatic handgun.
Officer Pollard testified he examined the fingerprints lifted in this case and confirmed that the print lifted from the driver's door matched that of Defendant.
Jim Huey testified that he worked at the Orleans Parish Sheriff's Department and was the custodian of records of inmate telephone calls. He stated that the phone calls of the inmates are recorded on an internet-based system and stored on a secured database. Mr. Huey testified that when an inmate makes a call, the inmate must use a pin/folder number that was issued to the inmate at the time of booking. One of Mr. Huey's duties is to provide law enforcement agencies with copies of an inmate's jailhouse telephone calls. Mr. Huey explained that when an inmate makes a call from the Orleans Parish Prison, the inmate is issued a warning that the call will be monitored and recorded. Mr. Huey also noted that a call detail sheet, which lists the specifics of an inmate call, such as the name of the caller, time, duration, number called, etc., accompanied the recording of jailhouse calls. Pursuant to the State's request, Huey supplied a disc containing two calls Defendant made while incarcerated in September and November 2015. The State played the recordings for the jury. In the first call, Defendant spoke to an unidentified male and learned that "Wink," apparently Byron Johnson, accepted a forty-five-year plea deal. Defendant told the unidentified male he was going to try to get a plea deal for "all" of the crimes. In the second call, Defendant is heard telling a female that he wants to take twenty years for "everything," but that the District Attorney would not agree to it.
ANALYSIS
Errors Patent
A review for errors patent on the face of the record reveals none.
Assignment of Error No. 3
We first address Appellant's third assignment of error, which challenges the sufficiency of the evidence against him. We do this because "[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, we [the reviewing court] first determine the sufficiency of the evidence."
*787 State v. George , 2015-1189, p. 9 (La.App. 4 Cir. 11/9/16), 204 So.3d 704, 711 (quoting State v. Marcantel , 2000-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55 ). Such review is governed by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In State v. White, 2014-0397, p. 16 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 188, this Court recently reiterated the applicable standard of review for sufficiency of evidence claims:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Green, 588 So.2d 757, 758 (La.App. 4th Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La. 1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The factfinder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. See Mussall, supra ; Green, supra . "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La. 1992).
"It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." State v. Webb, 2013-0146, p. 15 (La.App. 4 Cir. 1/30/14), 133 So.3d 258, 269 (citing State v. Cummings , 1995-1377 (La. 2/28/96), 668 So.2d 1132 ). Credibility determinations are questions of fact "within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." Id. , 2013-0146, pp. 15-16, 133 So.3d at 269 (citing State v. Vessell, 450 So.2d 938, 943 (La. 1984) ). This court has observed that even in the absence of physical evidence, "the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion." State v. Lambert , 2015-0886, pp. 6-7 (La.App. 4 Cir. 1/20/16), 186 So.3d 728, 734. The jury has great discretion in deciding whether to believe or reject a witness's testimony. See State v. Mussall, 523 So.2d 1305, 1310 (La. 1988).
Defendant was convicted of the armed robbery and second degree murder of Valon May, the armed robbery and attempted second degree murder of Sanford Kaynor and the armed robbery of Mary Cowan. Armed robbery[1] is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. Second degree murder[2] is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm, or the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of an armed robbery despite having no intent to kill or inflict great bodily harm. Both offenses are specific intent *788 crimes. "Specific intent may be inferred from the circumstances and actions of the defendant, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries." State v. Bernard , 2014-0580, p. 12 (La.App. 4 Cir. 6/3/15), 171 So.3d 1063, 1073 (citing State v. Seals, 1995-0305 (La. 11/25/96), 684 So.2d 368, 373-74 ). A person is guilty of an attempt when he, "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended[.]" La.R.S. 14:27(A). Principals are "all persons concerned in the commission of the crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." La.R.S. 14:24. Principals are equally culpable for a crime, even if they do not personally commit the acts of the charged offense. State v. Neal , 2000-0674, p. 12 (La. 6/29/01), 796 So.2d 649, 659.
Regarding the evidence supporting the armed robbery and second degree murder of Valon May, the State adduced the following: Ms. Smith witnessed the armed robbery and murder of Mr. May. She was in front of the victim's vehicle when the armed Defendant approached the driver's side of the car and Devante Billy got into the front passenger seat. She heard Defendant order Mr. May to give him his wallet. As Mr. May complied, Devante Billy removed the car's GPS system and got into the back seat behind Mr. May. Ms. Smith saw Defendant hand Devante Billy a gun and tell him to shoot Mr. May. She was only feet away from the car when Billy shot Mr. May in the back of the head. As Defendant and Billy fled, Defendant was carrying the GPS device and Billy was holding the gun. Ms. Smith admitted she met with the police on several occasions after the murder and initially lied to them about the shooting. However, she explained that she lied to the police because Billy threatened to have her and Ms. Cobb murdered if they spoke to the police. Ms. Cobb's testimony also demonstrated Defendant's participation in the armed robbery and murder of Mr. May. On the night in question, she and Ms. Smith attended a baseball game with the Defendant and Billy, then went to Defendant's house. After the shooting, the four attended a party together. Although she did not actually hear the exchanges between Mr. May, Defendant and Billy, Ms. Cobb verified that Billy was in the back seat of the victim's car when she heard the gunshots. When she looked in the direction of the shots, Ms. Cobb observed Billy and Defendant running from the scene. Billy was carrying a gun and Defendant held a GPS device in his hand. Both witnesses identified Defendant from six-person lineups. Furthermore, a search of the residence occupied by Defendant revealed clothing which fit the description Ms. Cobb and Ms. Smith said Defendant wore on the night of the shooting, a non-operational GPS device, consistent with the type stolen from Mr. May's vehicle and one bullet which matched the ammunition used to shoot him. During an interview with Defendant and his parents, Defendant even placed himself at the scene, admitting he was present when the victim was shot, though claiming he was making a drug sale to the victim when "Don Tavis" walked up and shot the victim.
Regarding the evidence supporting the armed robbery and attempted second degree murder of Sanford Kaynor, the State adduced the following: Officer Walter Edmond found Mr. Kaynor lying wounded in the driveway of his house on the night of October 2, 2012. Officer Edmond *789 was the first person on the scene, shortly after hearing the gunshots. Mr. Kaynor told Officer Edmond that he had been shot by two black males, who also stole his vehicle. Mrs. Kaynor testified that her husband told her three teenage males, one wearing a mask and two holding guns, were waiting for him in the driveway and shot him. When Mr. Kaynor's stolen vehicle was retrieved, the driver's side interior door handle contained Defendant's fingerprints. Testing of the black and white bandana retrieved in the Kaynor's driveway contained Defendant's DNA. The stolen truck used in the Kaynor armed robbery and shooting contained Defendant's fingerprints and was retrieved from the 7800 block of Burke Avenue, in close proximity to the residence where Defendant was staying at the time of the crimes. When the police searched Defendant's bedroom at 8841 Gervais Street, they located property belonging to the Kaynors.
Lastly, regarding the evidence supporting the armed robbery of Ms. Cowan, the State adduced the following: Ms. Cowan testified that as she exited the front passenger seat of her sister's car, she noticed two black males running toward her. One demanded her belongings and assured her his companion was armed should she resist. The same individual pulled her purse from her shoulder, took her wallet and fled with his accomplice. Ms. Cowan described her assailant as a slightly built, teen-aged, light skinned black male, approximately five feet, nine inches tall with his hair in twists. In the days following the incident, Ms. Cowan viewed three six-person photographic lineups, but did not identify anyone from those lineups. In March 2012, Ms. Cowan met with Detective Krzemieniecki, who showed her a fourth photographic lineup. From that lineup, Ms. Cowan identified Defendant as the unarmed robber, who pulled her purse from her on the night of the incident. When police searched Defendant's bedroom at 8841 Gervais Street, they found Ms. Cowan's identification and credit cards.
Considering the record as a whole as to each of the convictions, which includes eyewitness testimony and circumstantial evidence, and adopting a view of all of the evidence most favorable to the State, we find that the evidence was indeed sufficient for a rational trier of fact to find the Defendant guilty. While Defendant would characterize key eyewitness testimony against him as "incredible," it is not the function of this Court to substitute its judgment of credibility for that of the jury. Accordingly, we find that this assignment of error lacks merit.
Assignment of Error No. One
Defendant claims he was denied a fair trial by the State's introduction of prejudicial hearsay evidence, specifically, the guilty pleas of his non-testifying co-defendant, Byron Johnson. Defendant argues the evidence was irrelevant to the question of his guilt. Defendant cites two instances which occurred during the State's opening statement, to which there was no objection lodged. In the first reference, the State stated:
I'm going to point out right now Byron Johnson came in this court room a couple of months ago, looked that family in the eye, the family of Ms. Kaynor, and pled guilty as charged to every single count in this indictment. You will not hear me say a nice thing about Byron, but at least he had the decency to do that. He took a 45 year sentence for the crime spree on October 2, 2012. He pled guilty as charged to everything.
In the second reference, the State stated:
Now, as I told you ladies and gentlemen Byron Johnson stood in this courtroom with Ms. Kaynor present and pled *790 guilty to being a part of all this. He took 45 years in jail.
Defendant also points to two references made during the State's direct examinations of Detective Norman and Ms. Becnel, wherein they were asked whether Mr. Johnson pled guilty. The defense objected, and the district court sustained the objections.[3]
Louisiana Code of Evidence art. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." As Byron Johnson did not testify at trial, evidence of his guilty pleas could indeed be deemed inadmissible hearsay, absent an applicable exception or exclusion. Thus, we must consider its effect on the jury in the context of the trial as a whole to determine whether the error was harmless or not. In other words, the verdict may stand if this Court finds that the guilty verdict rendered is unattributable to the error. Sullivan v. Louisiana , 508 U.S. 275, 279, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993).
Apart from the State's allusion to Byron Johnson's pleas, the State presented substantial direct and circumstantial evidence of Defendant's guilt. Ms. Smith testified she witnessed Defendant's involvement in the shooting and robbing of Mr. May at gunpoint. Ms. Cobb said she saw Defendant fleeing the shooting scene carrying the GPS system removed from Mr. May's vehicle. Police obtained clothing from Defendant's bedroom that fit the descriptions given by the witnesses. Defendant's DNA was found on the black and white bandana retrieved from the Kaynor's residence and his fingerprints were lifted from Mr. Kaynor's vehicle. Mrs. Kaynor's purse, wallet and keys were discovered during the search of Defendant's residence. Furthermore, Ms. Cowan identified the Defendant from a photographic lineup as one of the men who robbed her at gunpoint. Defendant's jailhouse telephone calls revealed he admitted to a male friend and his girlfriend that he was willing to plea bargain with the State and take twenty years "for all of the [indicted] charges."
In light of the foregoing, this Court concludes that while the admission of Byron Johnson's guilty pleas was improper, the jury's verdict was unattributable to the error. The disclosure of the pleas was corroborative of other, substantial evidence of the Defendant's guilt presented by the State. Accordingly, we find the error was harmless; thus, this assignment of error lacks merit.
Assignment of Error No. 2
Defendant next argues the trial court erred by denying his motion for mistrial based upon the State's alleged impermissible reference to Defendant's post-arrest silence.
The United States Supreme Court, in Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), held that the State's use of a defendant's silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment. "A Doyle violation is characterized as a trial error which is subject to a harmless error analysis." State v. Marshall , 2013-2007, p. 7 (La. 12/9/14), 157 So.3d 563, 567. In conducting such an analysis in this context, the question to consider "is not whether, in a trial that occurred without the error, a guilty verdict would *791 surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan , 508 U.S. at 279, 113 S.Ct. at 2081 (emphasis in original).
If a prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court must admonish the jury upon defendant's request. State v. Kersey, 406 So.2d 555, 560 (La. 1981). "In such cases where the court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, upon motion of the defendant, the court may grant a mistrial." Id. In State v. Henry , 2011-1137, pp. 15-16 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1025, this Court stated:
Upon motion of a defendant a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it "impossible for the defendant to obtain a fair trial." La.C.Cr.P. art. 775. However, a "[m]istrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown." State v. Burton, 09-0826, p. 10 (La.App. 4 Cir. 7/14/10), 43 So.3d 1073, 1080 (quoting State v. Castleberry, 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768 ). A trial court has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. State v. Leonard, 05-1382, p. 11 (La. 6/16/06), 932 So.2d 660, 667. A trial court's decision as to whether actual prejudice has occurred and whether a mistrial is warranted will not be overturned on appeal absent an abuse of that discretion. State v. Maxwell, 11-0564, p. 25 (La.App. 4 Cir. 12/21/11), 83 So.3d 113, 128.
In the case sub judice , Defendant claims the State twice improperly raised his post-arrest silence. During the State's re-direct examination of Detective Krzemieniecki, the State asked:
To your knowledge have they [Defendant's parents] reached out to the New Orleans Police Department at any point to provide any type of exculpatory evidence regarding where [Defendant] was on [the nights of the incidents]?
...
Regarding just October 2, 2012, your investigation in the three plus years has anyone including [Defendant's] parents come to you and given you an alibi for where he [Defendant] was on the evening of October 2, 2012?
As a result, defense counsel moved for a mistrial and the jury was removed from the courtroom. Defense counsel complained that the prosecution's query about "anyone" supplying an alibi for Defendant would necessarily include Defendant himself, thereby rendering the reference an improper comment on his right to remain silent. The State claimed there was no intent to implicate Defendant, or an explicit mention of his post-arrest silence, and that the State's questioning referred only to Defendant's parents. Moreover, the State maintained that defense counsel's questioning of Detective Krzemieniecki on cross-examination, regarding whether she ever spoke to the Defendant's parents, "opened the door" for the questions on re-direct. The court denied the motion for mistrial based on questions from the defense regarding whether the detective had ever spoken to Defendant's parents, while acknowledging that it was a "close" call. The State requested a jury instruction as a cautionary measure.[4]
*792 We hold the court's failure to grant a mistrial does not provide a ground for reversal in this matter, as the guilty verdict was surely unattributable to the error. Incidental or inadvertent references to post-arrest silence do not mandate a mistrial or reversal where "[t]he trial as a whole was fairly conducted, the proof of guilt is strong, and the State made no use of the silence for impeachment of the defendant's custodial silence." State v. Smith , 336 So.2d 867, 868-70 (La. 1976).[5] Given that the trial as a whole was fairly conducted, the proof of Defendant's guilt is strong, the State made no use of the silence for impeachment, the court sustained the defense's objections, and the court provided a cautionary instruction, we find the error did not contribute to the verdict and was therefore harmless. Thus, this assignment of error lacks merit.
Assignment of Error No. 4
Defendant next argues the trial court erred by allowing the introduction of the statements of Mr. Kaynor to Mrs. Kaynor as "dying declarations." Dying declarations are admissible as an exception to the hearsay rule if made by a person "while believing that his death was imminent concerning the cause or circumstances of what he believed to be his impending death." La.C.E. art. 804(B)(2). "A statement is admissible as a dying declaration if it is made when the declarant is conscious of his condition and aware of his approaching demise ... 'The victim need not express his awareness of his demise in direct terms, but rather the necessary state of mind may be inferred from the facts and circumstances surrounding the making of the declaration.' " State v. Bernard , 2014-0580, p. 17 (La.App. 4 Cir. 6/3/15), 171 So.3d 1063, 1076 (citing State v. Ramirez, 2009-350, (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 845 ). In analyzing the admissibility of such statements, therefore, courts should look to the timing and content of them. That is, "it must be shown that the declarant believed his death was imminent/impending and that the statement concerned the cause or circumstances of the impending death." State v. Moore , 2011-0025, p. 12 (La.App. 4 Cir. 9/7/11), 75 So.3d 22, 29. We review for abuse of discretion in this regard. Bernard , supra , 2014-0580, p. 17, 171 So.3d 1063, 1075.
In this case, the testimony adduced at trial showed that on October 2, 2012, Mr. Kaynor was shot several times in the torso during an armed robbery in his driveway, telling his wife "it's never going to be all right. I can't feel my legs." He underwent numerous surgeries and lapsed into a coma. When he regained consciousness on October 8, 2012, he told his wife the shooters were three teenagers who were fifteen to sixteen years old, two were armed, they were average size and one wore a mask. Later that evening, Mr. Kaynor developed a fever, became septic, suffered a massive brain hemorrhage and was no longer able to communicate.
The defense argues there was no evidence introduced that Mr. Kaynor was ever informed that his medical condition was terminal nor was there evidence that he stated he believed his death was imminent. Accordingly, the defense submits that Mr. Kaynor's statement to Mrs. Kaynor does not meet the criteria outlined in *793 La.C.E. art. 804(B)(2) to qualify as a dying declaration.
In ruling that the victim's statement to his wife his wife met the requisites for a dying declaration, the trial judge reasoned:
[The victim] knew the critical nature of his wounds. He knew that he was in an ICU unit. He knew that he had had multiple surgeries. He knew the seriousness of his own condition, based on his statements, based on where he was, based on a rational inference.
This court finds that his choice to tell his wife of this information of who had done this to him, in particular, with what information that he could provide, the court finds that it is a dying declaration.
The court finds it's reliable. I find that the repeated surgeries and in and out of coma and his medical condition is not something that he would have to be informed of like as in a doctor would need to explain to him every single scenario...
In State v. Bernard, supra , this Court considered jurisprudence relevant to the admission of dying declarations when the declarant did not die soon after making the statement:
In State v. Nicholson, 96-2110, p. 6 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, 177, this Court noted that a statement, even if it is made in response to a question, may be admitted as a dying declaration if it was made when the declarant was conscious of his condition and aware of his approaching demise. Also, the more serious the injury and the greater the victim is impaired, the more probable it is that the victim believed that he was dying. Id. The fact that [the victim] survived over twenty days after the shooting does not automatically render the statement inadmissible as a dying declaration. In Nicholson, 96-2110, p. 6-8, 703 So.2d at 176-77, this Court upheld the introduction of the victim's statements made to his mother and an investigating officer during his hospital stay as dying declarations even though the victim lingered for sixteen days before dying. See also State v. Matthews, 95-1245 (La.App. 4 Cir. 8/21/96), 679 So.2d 977 (finding victim's statements qualified as dying declarations, even though the victim did not tell anyone he knew he was going to die; also noting the victim's grave condition and that he told his mother he loved her just before lapsing into unconsciousness on the way to the hospital); State v. Foote, 379 So.2d 1058 (La. 1980) (holding the victim's statements at the scene to a neighbor and at the hospital to a deputy were admissible as dying declarations, where he died eleven days later from six gunshot wounds ; also considering that the victim remained comatose for much of the time before his death).
In State v. Winn, 97-2509, p. 6-7 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271, 1274, this Court stated that "[i]n determining whether the declarant believed that her death was imminent, courts have looked not only to any actual words of the declarant as to this belief, but also to the circumstances surrounding the statement, to determine if the declarant actually believed her demise was imminent." Thus, the declarant's belief that he was dying can be determined not only by the declarant's statement that he believes death is impending, but also by an assessment of the circumstances under which the declaration was made.
Bernard, 2014-0580, pp. 18-19, 171 So.3d at 1076-77.
Although this case does not present a scenario wherein the victim was bleeding to death on the scene when he described his attackers, it cannot be disputed that his injuries were life-threatening. "[T]he more *794 serious the injury and impairment of the declarant's physical condition, the more probable is his belief that the end is near." State v. Verrett , 419 So.2d 455, 457 (La. 1982) (citing State v. Augustus, 129 La. 617, 56 So. 551 (1911) ; G. Pugh, Louisiana Evidence Law , at p. 466 (1974).
The foregoing cases indicate this Court does not construe the law so narrowly as to restrict the admission of a dying declaration only when the victim dies at the scene, especially considering some victims' lives are prolonged through medical intervention only to succumb to their wounds at a later time. Indeed, in Nicholson , supra , 1996-2110, p.7, 703 So.2d at 177, this Court maintained the introduction of the victim's statements as dying declarations while lingering for sixteen days before dying, despite no clear evidence regarding when the victim made the declaration. While the doctors in Nicholson informed the victim that they did not expect him to live, the district court in the case sub judice pointed to the circumstances surrounding Mr. Kaynor's statement as evidence that he was of the necessary state of mind. Cf. State v. Henderson , 1995-0267, p. 5 (La.App. 4 Cir. 4/3/96), 672 So.2d 1085, 1089 (holding that "the awareness that death approaches may be established by the circumstances under which the statement was made; it is not necessary that the victim express this belief.")
Based on the foregoing jurisprudence, and the reasons provided by the district court in support of its ruling, we cannot say that the district court abused its discretion in finding that the victim's statement to his wife constituted an admissible dying declaration. Thus, we find this error to lack merit.
Assignment of Error No. 5
By this assignment, Defendant challenges the trial court's denial of his Motion for New Trial based the admissions of Byron Johnson's guilty pleas, Sanford Kaynor's "dying declaration," and the State's reference to his post-arrest silence. However, having concluded that these assignments of error lack merit, we find no error in the trial court's denial of the motion.
Assignment of Error Nos. 6, 7 and 8
By these assignments, Defendant argues that his consecutive sentences are cruel and unusual punishment, as well as excessive, and therefore unconstitutional. Defendant also challenges the denial of his motion to reconsider sentence.
The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, while Article I, § 20 of the Louisiana Constitution also prohibits the imposition of excessive punishment. State v. Wilson, 2014-1267, p. 24 (La.App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. A trial judge has broad discretion to sentence within statutory limits. State v. Wilson , 2011-0960, p. 10 (La.App. 4 Cir. 9/5/12), 99 So.3d 1067, 1074. "[A] sentence is excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering." State v. Bonanno , 384 So.2d 355, 357 (La. 1980).
Defendant claims the trial judge improperly considered his decision to exercise his right to trial as an "aggravating factor" in sentencing him and punished him for doing so by imposing consecutive sentences without benefits. Pursuant to La.C.Cr.P. art. 883 :
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.
*795 Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
"Although sentences for crimes arising out of a single course of conduct are generally served concurrently, the imposition of consecutive sentences for such crimes is not automatically excessive." State v. Collins, 557 So.2d 269, 272 (La.App. 4 Cir. 1990). A court may impose consecutive sentences for same transaction crimes if the court expressly directs the imposition of consecutive sentences and articulates appropriate factors that justify the imposition of such sentences. See State v. Jackson, 552 So.2d 445, 448 (La.App. 4 Cir. 1989). These factors include those enumerated in La.C.Cr.P. art. 894.1, such as whether the defendant poses an unusual risk to the safety of the public, the defendant's criminal history, the dangerousness of the offense, the viciousness of the crimes, the harm done to the victim, and the potential for defendant's rehabilitation.
At his sentencing, Defendant addressed the court, stating, "I want to thank the family for forgiving me for what happened to y'all families, your family members. And I want to apologize for what happened as well. And, you know, that you all would forgive me. That's it." In sentencing Defendant, the trial judge stated:
Mr. Carter, it's the sentence of this Court, you were 16 years old at the time of this crime [sic], October 2 and October 19.
You are now 19 years old. You went to trial while you were 19 years old. You were tried on six counts. Count 4, you were found guilty as charged of the armed robbery with a firearm of victim Sanford Kaynor. This is a crime of violence.
It's the sentence of this Court that you serve 99 years at hard labor in the Department of Corrections. That sentence will be without benefit of parole, probation or suspension of sentence.
Additionally, you will be sentenced to five years for the firearm enhancement, for using a firearm during the commission of this offense. This sentence is consecutive to the 99 years, also without benefit of parole, probation or suspension of sentence. That's a total of 104 years.
Count 5, you were found guilty as charged of the attempted second degree murder of victim Sanford Kaynor. This is also a crime of violence. Your sentence on that matter is 50 years at hard labor in the Department of Corrections without benefit of parole, probation or suspension of sentence.
Count 6, the jury found you not guilty.
Count 9, you were found guilty as charged of armed robbery with a firearm of the victim Mary Cowan. That also is a crime of violence. It's the sentence of this Court that you serve 99 years at hard labor in the Department of Corrections without benefit of parole, probation, or suspension of sentence.
Additionally, you will be sentenced to five years for the firearm enhancement, for use of a firearm during that crime. That five-year sentence is also consecutive to the 99-year sentence. And that sentence will be without benefit of the parole, probation, or suspension of sentence. That sentence for Count 9 is 104 years.
Counts 3, 4 and 5 are each to run consecutive to each other ...
On Count 14, through your own actions this Court is assured in its assessment that you feel no empathy. This Court noted through your trial and your demeanor you've displayed that you have callousness towards other human beings. And the crimes that you have *796 committed, I find that there is no remorse towards the people whose families that you have turned upside down. You've torn families apart, including your own family.
I think your actions are utterly evil. I think that you are the worst of the worst. You disrespect the value of human life, you disrespect law, and you disrespect this Court. It's been made apparent from your jail actions for which we have heard telephone calls and also from your future dangerousness, which this Court takes into consideration in that you are continuing to be arrested for new crimes while in jail awaiting trial.
With that said, the Court finds that you fall into the category of one of the worst offenders of one of the worst offenses. For Count 14, second degree murder of Valon May, you were found guilty as charged of second degree murder. I sentence you to life in prison in the Department of Corrections at hard labor without the benefit of parole for 35 years, you will be eligible to be considered, but this sentence will also run consecutive to the other sentences.
I have considered the mitigating factors as required by Miller v. Alabama, as well as Montgomery v. Louisiana . I find under the Code of Criminal Procedure, Article 878.1, that you are to be considered for parole on that one count after you have served 35 years on this sentence.
Count 16, you were found guilty as charged on armed robbery with a firearm of victim Valon May. This is also a crime of violence. It's the sentence of this Court that you serve 99 years at hard labor in the Department of Corrections. That sentence will be without benefit of parole, probation, or suspension of sentence.
You're also found guilty of having used a firearm as an enhancement under [La.R.S. 14:]64.1 that five years on that sentence for having used a firearm will be consecutive to the 99-year sentence. Therefore, your sentence on Count 16 will be 104 years. That's a total - that sentence will be consecutive to the sentences in Count 4, Count 5, Count 9 and Count 14. That's a total of a life sentence plus 362 years with eligibility for parole consideration on the one count of life after 35 years.
You have the opportunity to earn that consideration. You are not given that consideration. You are not eligible for that unless you earn it. It's this Court's understanding that your conduct during the commission of the offense manifested deliberate cruelty to the victims, that the offender knowingly created a risk of death or great bodily harm to more than one person, that the offender used actual violence in the commission of these offenses.
This Court finds that you are in need of correctional treatment or a custodial environment that can be provided most effectively by your commitment to an institution for the maximum length of time. A lesser sentence, which this Court did consider, would deprecate the seriousness of your crime.
The offense resulted in significant permanent injury or significant economic loss to the victim or its family. You used dangerous weapons in the commission of this offense. The offenses involved multiple victims and incidents for which separate sentences have now been imposed. Thus, based on your crime spree, this Court finds that the maximum sentence is appropriate for you.
I find that you are a leader. And in your violation, you worked in concert with one or more other persons with *797 respect to whom the offender occupied a position of the organizer, supervisory position, or any other position of management in the killing of Valon May. I find that you foreseeably endangered human life by discharging a firearm during the commission of an offense which has as an element the use, attempted use, or threatened use of physical force against a person or property of another in which, by its very nature, involves a substantial risk that physical force may be used in the course of committing the offense.
I find that you used a firearm or other dangerous weapon while committing or attempting to commit an offense, which has as an element, the use, attempted use, or threatened use of physical force against the person or property of another in which, by its very nature, involves a substantial risk that physical force may be used in the course of committing this offense.
This Court will not be available in 35 years, but by my words, the parole board and other courts can listen to what this Court had to say. And I find that you deserve the maximum sentence on every count.
You are given the benefit, thanks to the United States Supreme Court, that you were eligible for parole consideration on a life-sentenced case, but on the other cases, they will all run consecutively.
Defendant was sixteen years old at the time he committed the offenses. In State v. Williams , 2015-0866, pp. 13-14 (La.App. 4 Cir. 1/20/16), 186 So.3d 242, 250-51, this Court noted:
For those offenders convicted of second degree murder in Louisiana, La.R.S. 14:30.1 mandates a sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. However, in 2012, the United States Supreme Court, in Miller v. Alabama, [567] U.S. [460], 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), held that a state's statutory sentencing scheme that mandates life imprisonment without parole, for those offenders under the age of eighteen years at the time they committed a homicide offense, violates the Eighth Amendment prohibition of "cruel and unusual punishments." The Miller Court did not prohibit life imprisonment without parole for juveniles, but instead required that the statutory sentencing scheme authorize a sentencing court to consider an offender's youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for juveniles who have committed a homicide offense. State v. Simmons , 2011-1810, p. 2 (La. 10/12/12), 99 So.3d 28 (per curiam ).
In 2013, in response to Miller v. Alabama, supra, the Louisiana Legislature enacted La.C.Cr.P. art. 878.1 and La.R.S. 15:574.4(E)(1).
La.C.Cr.P. art. 878.1, which became effective on August 1, 2013, provides:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder ( R.S. 14:30 ) or second degree murder ( R.S. 14:30.1 ) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).
B. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of *798 the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender's level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
The Louisiana Supreme Court, in State v. Brown , 2012-0872, p. 1 (La. 5/7/13), 118 So.3d 332, 332, "consider[ed] whether the United States Supreme Court's decision in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010),[6] applie[d] in a case in which the juvenile offender committed multiple offenses resulting in cumulative sentences matching or exceeding his life expectancy without the opportunity of securing early release from confinement." In Brown , the Court noted that defendant, a juvenile, had committed a number of crimes at the same time, and had been sentenced to life without parole for aggravated kidnapping. Id. , 2012-0872, p. 3, 118 So.3d at 334. The defendant also received four ten-year terms, without benefit of parole, for four counts of armed robbery, all sentences to run consecutively. Id. In the context of a motion to correct an illegal sentence, the Court concluded that " Graham does not prohibit consecutive term of year sentences for multiple offenses committed while a defendant was under the age of 18, even if they might exceed a defendant's lifetime." Id. , 2012-0872, p. 15, 118 So.3d at 341. Accordingly, though the defendant properly received parole eligibility on his life sentence, the Court found Graham did not prohibit stacking another forty years on top of his parole date (which forty-year sentence was also to be served without parole eligibility). Id., 2012-0872, pp. 14-16, 118 So.3d at 341-42.
Just a few years later, in State ex rel. Morgan v. State , 2015-0100, p.1 (La. 10/19/16), 217 So.3d 266, 268, the Louisiana Supreme Court held that "a 99-year sentence without parole [for a juvenile] is illegal because it does not provide the defendant 'with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " In Morgan , the defendant was sentenced to a ninety-nine year prison term for a single count of armed robbery, which the Court characterized as "the functional equivalent of a life sentence[,]" illegal under Graham . Accordingly, the Court deleted that portion of the defendant's sentence denying him parole eligibility.
Here, we have a Defendant who has committed a number of offenses, like the defendant in Brown , but who was also sentenced to "effective life sentences," which, standing alone, violate Graham for their failure to provide for parole eligibility. Specifically, as to counts four, nine, and sixteen, Defendant received sentences of 104 years each, without benefit of parole, probation, or suspension of sentence, despite being non-homicide offenses. While Brown stands for the proposition that Defendant's consecutive sentences may amount to an effective life sentence without violating Graham , it does not absolve the district court of imposing otherwise legal sentences on those counts for which Graham mandates that he be eligible for parole. We do note that the dissent suggests "the facts of this case require a sentence in line with the reasoning of [ Brown ], wherein the Court concluded that Graham does not prohibit consecutive term of year sentences for multiple offenses *799 committed. " (emphasis in original) It is not lost on this Court just how horrific the underlying facts of this case are. However, this Court is bound to follow the precedent of the Louisiana Supreme Court. In Brown , the Court reasoned that consecutive sentences amounting to an "effective life sentence" do not violate Graham , and this opinion does not hold that Defendant's consecutive sentences were improper. However, Morgan clearly held that a juvenile may not be sentenced, on a single count, to an "effective life sentence" for a non-homicide offense. Here, that is what the district court did in sentencing Defendant to 104-year terms on his armed robbery convictions. That Defendant's conduct constitutes the "worst of the worst" does not permit this Court to gloss over this fact and ignore rulings of our Supreme Court.
However, in all other respects, we find the sentence to not be cruel, unusual, or excessive punishment. Defendant victimized unsuspecting people steps from their homes, demanded their valuables, shot two of his victims, killing one and paralyzing the other. The judge's opinion that the Defendant was "one of the worst" is fully satisfied by the Defendant's vicious behavior. Furthermore, this Court and others have found like sentences for the same convictions to not be excessive. See State v. Graham , 2014-1769 (La.App. 1 Cir. 4/24/15), 171 So.3d 272, 282 (life without parole in a homicide case involving a sixteen-year-old defendant is not excessive and, therefore, is not unconstitutional under the Eighth Amendment); State v. Fletcher , 49,303, p. 28 (La.App. 2 Cir. 10/1/14), 149 So.3d 934, 950 (sentence of life imprisonment without possibility of parole for fifteen year old defendant did not violate ban on cruel and unusual punishment); State v. Wilson , 2014-1267, p. 29 (La.App. 4 Cir. 4/29/15), 165 So.3d 1150, 1168 (sentence of life imprisonment without parole was not constitutionally excessive for seventeen-year-old juvenile defendant convicted of second degree murder); State v. Davis, 2015-118, p. 11 (La.App. 5 Cir. 6/30/15), 171 So.3d 1223, 1230 (defendant's four life sentences imposed without possibility of parole, probation, or suspension of sentence were not excessive, following convictions on four counts of second degree murder, even though defendant was a juvenile when he committed the offenses); State v. Jones , 2015-157, p. 9 (La.App. 5 Cir. 9/23/15), 176 So.3d 713, 719 (seventeen-year-old defendant's sentence of life imprisonment at hard labor with parole eligibility after thirty-five years was not excessive, even though he was a juvenile when he committed offense; defendant received mandatory minimum sentence for second degree murder committed by juvenile).
In accordance with Morgan , the portion of Defendant's sentence denying him parole eligibility on his armed robbery convictions must be deleted. As the Louisiana Supreme Court did in Morgan , we order that Defendant be designated as parole-eligible in accordance with La.R.S. 15:574.4(D).
Assignments of Error Nos. 9 and 10
In his two final assignments, Defendant argues the trial court erroneously charged the jury as to the definition of the responsive verdict of manslaughter, and then compounded its error by failing to declare a mistrial.
The trial judge initially charged the jury:
Manslaughter is a responsive verdict. Manslaughter is the killing of a human being when the defendant is engaged in the commission of armed robbery even though there is no intent to kill...
Therefore, in order to convict the defendant of manslaughter, you must find:
*800 That the defendant killed Valon May whether or not he had an intent to kill; and 2, that the killing took place while the defendant was engaged in the commission of armed robbery.
If you are not convinced that the defendant is guilty of second degree murder, but you are convinced beyond a reasonable doubt that the defendant is guilty of manslaughter, the form of your verdict for count fourteen should be guilty of manslaughter.
During deliberations, the jury asked for clarification of the difference between manslaughter and second degree murder because "they sounded similar." The trial judge then instructed the jury:
Manslaughter is the killing of a human being when the defendant is engaged in the commission of armed robbery even though there is no intent to kill.
After issuing the foregoing clarification, the judge and attorneys had a bench conference. Realizing its error, the trial court correctly re-charged the jury:
Manslaughter. A homicide which would be murder but the offense is committed in sudden provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed.
After the jury exited the courtroom to resume deliberating, defense counsel addressed the judge:
We wanted to lodge our objection to a different reading of - well the jury instructions being changed in the middle of deliberations. I understand that their initial reading wasn't correct. However, those instructions were agreed upon prior to closing argument by both sides. By changing the instructions in the middle of deliberations my client is deprived of his right to argue based on the facts of this case as to the jury instruction as read to the jury a few moments ago. So now he is deprived of the right to present any closing arguments to the jury based on the correct reading of the manslaughter statute, and so we'd object and we'd move for a mistrial at this point.
Defendant argues prejudice on appeal because his trial counsel's mistake as to correct law concerning manslaughter, caused the jury to seek "clarification," which, to his detriment, resulted in confusion as a result of the multiple instructions given. He also claims that the late correction prevented him from arguing the facts as to the "correct" version of the law.
"An invalid instruction on the elements of an offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and the jury would have reached the same result if it had never heard the erroneous instruction." State v. Hongo , 1996-2060, p. 4 (La. 12/02/97), 706 So.2d 419, 421. "The determination is based upon 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' " Id. (quoting Sullivan v. Louisiana , 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original).
Here, any error in the jury instruction is harmless and surely unattributable to the verdict. The court correctly re-instructed the jury on the definition of manslaughter in time for the jury to incorporate it in deliberations. The jury's verdict finding Defendant guilty of second degree murder instead of manslaughter supports the suggestion that the jury understood the correct instruction as provided; additionally, the jury sought no further clarification.
*801 While the Defendant argues prejudice because the court's late correction of the definition of manslaughter prevented him from arguing the facts as to the "correct" version of the law, the transcript of the closing arguments indicates otherwise. Defense counsel vigorously opposed the prosecution, emphasizing Defendant's innocence. Multiple arguments were made during closing concerning the applicable law and highlighted what was perceived to be a lack of factual and evidentiary support for the case, including the unreliability of the State's witnesses and the dearth of scientific evidence. Defendant has failed to show prejudice, and a mistrial was not necessary. Thus, we find that this assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, we affirm the convictions of Defendant and find that his assignments of error lack merit. However, we delete those portions of Defendant's sentence denying him parole eligibility on his armed robbery convictions and order he be designated as parole-eligible in accordance with La.R.S. 15:574.4(D).
AMENDED IN PART, AND AFFIRMED AS AMENDED
DYSART, J., DISSENTS IN PART, WITH REASONS.
I find that the facts of this case require a departure from the sentencing guideline set forth in State ex rel. Morgan v. State, 15-0100 (La. 10/19/16), 217 So.3d 266, wherein the Supreme Court found a ninety-nine year sentence for a single non-homicide offense where the defendant was seventeen at the time of the offense, to be non-compliant with the United States Supreme Court's mandate in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). I believe the facts of this case require a sentence in line with the reasoning of State v. Brown, 12-0872 (La. 5/7/13), 118 So.3d 332, wherein the Court concluded that Graham does not prohibit consecutive term of year sentences for multiple offenses committed. Id. 12-0872, p. 15, 118 So.3d at 341.
In this case, the defendant went on a crime spree over the course of several days, during which he participated in the armed robbery of three people, the attempted murder of one person, and the murder of another person. He victimized unsuspecting people just steps from their homes, demanded their valuables, and was involved in the shooting of two of the victims - killing one and paralyzing the other - even as those victims complied with his demands. There was evidence presented that the defendant went to a party with his cohorts after murdering Valon May. The sentencing court considered the defendant's obvious lack of remorse, and the fact that he continued to commit crimes while in jail, describing the defendant as "the worst of the worse."
Considering the underlying facts of this case, I find no error in the trial court's sentence and would affirm his convictions and sentences. I therefore dissent from the majority opinion.

Defined in La.R.S. 14:64(A).

Defined, in relevant part, in La.R.S. 14:30.1.

The defense did not request that the jury be instructed to disregard the evidence, and there was no motion for mistrial.

The court charged the jury, "You are not to consider Charles Carter's choice to remain silent, and that choice cannot be held against him. Again, Charles Carter does not have the burden in this case."

The Smith Court, on rehearing, found "the error was harmless beyond a reasonable doubt[,]" despite the then-recent Doyle decision.

Graham held that the Eighth Amendment to the U.S. Constitution prohibited life without parole sentences for juveniles convicted of non-homicide offenses, and that juveniles sentenced to such a sentence must be given a meaningful opportunity to obtain release.